CARCHMAN, MERCER COUNTY PROSECUTOR
*v.* NASH

No. 84–776.   Argued April 22, 1985—Decided July 2, 1985*

*Together with No. 84–835, *New Jersey Department of Corrections* v. *Nash,* also on certiorari to the same court.

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and STEVENS, JJ., joined, *post*, p. 734.

*Philip S. Carchman, pro se,* argued the cause for petitioners in both cases. With him on the brief for petitioner in No. 84–776 was *William J. Flanagan. Irwin I. Kimmelman,* Attorney General of New Jersey, *James J. Ciancia,* Assistant Attorney General, and *Catherine M. Brown,* Deputy Attorney General, filed a brief for petitioner in No. 84–835.

*John Burke III* argued the cause *pro hac vice* for respondent in both cases. With him on the brief was *Joseph H. Rodriguez.*†

JUSTICE BLACKMUN delivered the opinion of the Court.

Article III of the Interstate Agreement on Detainers gives a prisoner incarcerated in one State the right to demand the speedy disposition of "any untried indictment, information or

---

†A brief for the State of Pennsylvania et al. as *amici curiae* urging reversal was filed by *LeRoy S. Zimmerman,* Attorney General of Pennsylvania, *Francis R. Filipi* and *Andrew S. Gordon,* Senior Deputy Attorneys General, *Allen C. Warshaw,* Chief Deputy Attorney General, and by the Attorneys General of their respective States as follows: *Charles A. Graddick* of Alabama, *Norman C. Gorsuch* of Alaska, *Robert K. Corbin* of Arizona, *John Steven Clark* of Arkansas, *John K. Van de Kamp* of California, *Duane Woodard* of Colorado, *Charles M. Oberly* of Delaware, *Jim Smith* of Florida, *Michael J. Bowers* of Georgia, *Michael A. Lilly* of Hawaii, *Jim Jones* of Idaho, *Neil F. Hartigan* of Illinois, *Linley E. Pearson* of Indiana, *Thomas J. Miller* of Iowa, *Robert T. Stephan* of Kansas, *David L. Armstrong* of Kentucky, *James Tierney* of Maine, *Francis X. Bellotti* of Massachusetts, *Hubert H. Humphrey III* of Minnesota, *William L. Webster* of Missouri, *A. Eugene Crump* of Nebraska, *Brian McKay* of Nevada, *Stephen E. Merrill* of New Hampshire, *Lacy H. Thornburg* of North Carolina, *Anthony Celebrezze* of Ohio, *Arlene Violet* of Rhode Island, *T. Travis Medlock* of South Carolina, *Mark V. Meierhenry* of South Dakota, *W. J. Michael Cody* of Tennessee, *Jim Mattox* of Texas, *Jeffrey Amestoy* of Vermont, *Gerald L. Baliles* of Virginia, *Kenneth O. Eikenberry* of Washington, *Charlie Brown* of West Virginia, *Bronson C. La Follette* of Wisconsin, and *Archie G. McClintock* of Wyoming.

*Stephen A. Saltzburg* filed a brief for the University of Virginia School of Law Post-Conviction Assistance Project as *amicus curiae* urging affirmance.

complaint" that is the basis of a detainer lodged against him by another State. These cases present the issue whether Art. III applies to detainers based on probation-violation charges.

I

The Interstate Agreement on Detainers (Agreement) is a compact among 48 States, the District of Columbia, Puerto Rico, the Virgin Islands, and the United States. The Agreement was drafted in 1956 by the Council of State Governments and was adopted in 1958 by the State of New Jersey, where it is now codified as N. J. Stat. Ann. §2A:159A–1 *et seq.* (West 1971). The Agreement is a congressionally sanctioned interstate compact within the Compact Clause, U. S. Const., Art. I, §10, cl. 3, and thus is a federal law subject to federal construction. *Cuyler* v. *Adams*, 449 U. S. 433, 438–442 (1981).

A detainer is a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent. See *id.*, at 436, n. 3 (citing and quoting H. R. Rep. No. 91–1018, p. 2 (1970), and S. Rep. No. 91–1356, p. 2 (1970)); *United States* v. *Mauro*, 436 U. S. 340, 359 (1978); *Moody* v. *Daggett*, 429 U. S. 78, 80–81, n. 2 (1976); Council of State Governments, Suggested State Legislation, Program for 1957, p. 74 (1956). Detainers generally are based on outstanding criminal charges, outstanding parole- or probation-violation charges, or additional sentences already imposed against the prisoner. See Dauber, Reforming the Detainer System: A Case Study, 7 Crim. L. Bull. 669, 676 (1971). See generally L. Abramson, Criminal Detainers (1979).

The Agreement is based on a legislative finding that "charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct

programs of prisoner treatment and rehabilitation." Art. I. As has been explained:

> "The inmate who has a detainer against him is filled with anxiety and apprehension and frequently does not respond to a training program. He often must be kept in close custody, which bars him from treatment such as trustyships, moderations of custody and opportunity for transfer to farms and work camps. In many jurisdictions he is not eligible for parole; there is little hope for his release after an optimum period of training and treatment, when he is ready for return to society with an excellent possibility that he will not offend again. Instead, he often becomes embittered with continued institutionalization and the objective of the correctional system is defeated." Council of State Governments, Suggested State Legislation, Program for 1957, p. 74 (1956).

See also *Cuyler* v. *Adams*, 449 U. S., at 449; *United States* v. *Mauro*, 436 U. S., at 353, 356, 359–360. Accordingly, the purpose of the Agreement is "to encourage the expeditious and orderly disposition of [outstanding] charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." Art. I.

To achieve this purpose, Art. III of the Agreement establishes a procedure by which a prisoner incarcerated in one party State (the sending State) may demand the speedy disposition of "any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner"[1] by another party State (the receiving State).

---

[1] Article III(a) provides in pertinent part:

"Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within 180 days after he shall have caused to be delivered to the

Specifically, Art. III requires the warden to inform the prisoner that a detainer has been lodged against him and that he may request final disposition of the indictment, information, or complaint upon which the detainer is based. If the prisoner makes such a request, the warden must forward it, together with a certificate providing certain information about the prisoner's terms of confinement, to the appropriate prosecuting official and court of the receiving State. The authorities in the receiving State then must bring the prisoner to trial within 180 days, absent good cause shown, or the court must dismiss the indictment, information, or complaint with prejudice, and the detainer will cease to be of any force or effect.

## II

On June 21, 1976, respondent Richard Nash, in the Superior Court of New Jersey, Law Division, Mercer County, pleaded guilty to charges of breaking and entering with intent to rape, and of assault with intent to rape. On October 29, the Superior Court sentenced respondent to 18 months in prison on each count, with the sentences to run consecutively. The court suspended two years of the sentences and imposed a 2-year term of probation to follow respondent's imprisonment. On June 13, 1978, while on probation, respondent was arrested in Montgomery County, Pa., and charged with burglary, involuntary deviate sexual intercourse, and loitering. Respondent was tried and convicted on the Pennsylvania charges on March 14, 1979, and was sentenced on July 13 of that year.

While respondent was awaiting trial in Pennsylvania, the Mercer County Probation Department, on June 21, 1978,

_____

prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for final disposition to be made of the indictment, information or complaint: provided that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance."

notified the Superior Court that respondent had violated his probation by committing offenses in Pennsylvania. At the Department's request, the Superior Court issued a bench warrant for respondent's arrest. The warrant was lodged as a detainer with the appropriate corrections officials in Pennsylvania.

Beginning on April 13, 1979, respondent sent a series of letters to New Jersey officials requesting final disposition of the probation-violation charge. The State of New Jersey failed to bring respondent "to trial" on the probation-violation charge within 180 days after Art. III was invoked.

On March 6, 1980, respondent filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Pennsylvania seeking dismissal of the probation-violation charge on the basis of the State's non-compliance with Art. III. The case was transferred, pursuant to 28 U. S. C. § 1406(a), to the United States District Court for the District of New Jersey. App. to Pet. for Cert. in No. 84–776, p. 101. That court stayed respondent's federal action pending exhaustion of state-court remedies. *Id.*, at 81.

Respondent then petitioned for a writ of habeas corpus in New Jersey Superior Court. The Superior Court denied respondent's motion to dismiss the probation-violation charge, ruled that respondent's Pennsylvania convictions constituted a probation violation, and ordered respondent to serve the two consecutive 18-month sentences on his New Jersey convictions, with credit for 249 days respondent had served in 1976 and 1977. The Appellate Division affirmed the trial court's judgment, *id.*, at 44, and the New Jersey Supreme Court denied certification. *Id.*, at 43.

Respondent then returned to the United States District Court for the District of New Jersey. On March 21, 1983, the District Court granted the petition for a writ of habeas corpus, vacated respondent's probation revocation, and or-

dered his release from state custody.[2] 558 F. Supp. 641 (1983). Petitioner Philip S. Carchman, the Mercer County prosecutor, took an appeal to the United States Court of Appeals for the Third Circuit. Petitioner State of New Jersey, Department of Corrections, at this point sought to intervene because the District Court's decision invalidated its policy that parole- and probation-violation detainers do not fall within Art. III of the Agreement. Its motion to intervene was granted by the Court of Appeals. App. to Pet. for Cert. in No. 84–776, p. 18.

The Court of Appeals affirmed, holding that an outstanding probation-violation charge is an "untried indictment, information or complaint" within the meaning of Art. III of the Agreement.[3] *Nash* v. *Jeffes,* 739 F. 2d 878 (1984). In reaching its decision, the Court of Appeals "decline[d] to adopt a technical interpretation of the relevant language of Article III," *id.,* at 883, and instead relied on "the broader purposes of the legislation." *Id.,* at 882. The court reasoned that a principal purpose of Art. III is to enable prison-

---

[2] The District Court ruled that respondent's letters requesting disposition of the detainer were sufficient to invoke Art. III, even though they did not strictly comply with Art. III's request procedures. The Court of Appeals affirmed that ruling. We assume, without deciding, that this ruling on the issue whether respondent complied with the procedures of Art. III is correct.

[3] This holding conflicts with rulings of the United States Court of Appeals for the Ninth Circuit and of four state courts of last resort. See *United States* v. *Roach,* 745 F. 2d 1252 (CA9 1984); *Padilla* v. *State,* 279 Ark. 100, 648 S. W. 2d 797 (1983); *Suggs* v. *Hopper,* 234 Ga. 242, 215 S. E. 2d 246 (1975); *Clipper* v. *State,* 295 Md. 303, 455 A. 2d 973 (1983); *State* v. *Knowles,* 275 S. C. 312, 270 S. E. 2d 133 (1980). It also conflicts with rulings of several intermediate state appellate courts. See, *e. g., People* v. *Jackson,* 626 P. 2d 723 (Colo. App. 1981); *People ex rel. Capalongo* v. *Howard,* 87 App. Div. 2d 242, 453 N. Y. S. 2d 45 (1982); *Blackwell* v. *State,* 546 S. W. 2d 828 (Tenn. Crim. App. 1976). See *Nash* v. *Jeffes,* 739 F. 2d 878, 881, n. 4 (CA3 1984) (citing cases involving parole- and probation-violation detainers).

ers to obtain prompt disposition of the charges underlying detainers in order to protect them from the adverse consequences that detainers have on their treatment and rehabilitation, and that this purpose would be furthered by applying Art. III to detainers based on probation-violation charges. The Court of Appeals completed its "policy analysis," *id.*, at 883, n. 9, by concluding that the benefit to prisoners of applying Art. III to probation-violation detainers would outweigh the administrative burdens, including additional paperwork and the cost of transporting prisoners in order to provide them with probation-revocation hearings.

In view of the conflict, see n. 3, *supra*, we granted certiorari. 469 U. S. 1157 (1985).

## III

### A

We begin by considering the language of the Agreement. Article III by its terms applies to detainers based on "any untried indictment, information or complaint." The most natural interpretation of the words "indictment," "information," and "complaint" is that they refer to documents charging an individual with having committed a criminal offense. See Fed. Rules Crim. Proc. 3 (complaint) and 7 (indictment and information). This interpretation is reinforced by the adjective "untried," which would seem to refer to matters that can be brought to full trial, and by Art. III's requirement that a prisoner who requests final disposition of the indictment, information, or complaint "shall be *brought to trial* within 180 days." (Emphasis added.)

The language of Art. V also indicates that Art. III should be interpreted to apply solely to criminal charges. Article V(a) provides: "In response to a request made under Article III or Article IV hereof, the appropriate authority in a sending State shall offer to deliver temporary custody of such prisoner to the appropriate authority in the State where such indictment, information or complaint is pending

against such person in order that speedy and efficient *prosecution* may be had." (Emphasis added.) Article V(c) provides that "in the event that an action on the indictment, information or complaint on the basis of which the detainer has been lodged is not *brought to trial* within the period provided in Article III or Article IV hereof, the appropriate court of the jurisdiction where the indictment, information or complaint has been pending shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect." (Emphasis added.) Finally, Art. V(d) provides: "The temporary custody referred to in this agreement shall be only for the purpose of permitting *prosecution* on the charge or charges contained in 1 or more untried indictments, informations or complaints which form the basis of the detainer or detainers or for *prosecution* on any other charge or charges arising out of the same transaction." (Emphasis added.)

The language of the Agreement therefore makes clear that the phrase "untried indictment, information or complaint" in Art. III refers to criminal charges pending against a prisoner. A probation-violation charge, which does not accuse an individual with having committed a criminal offense in the sense of initiating a prosecution, thus does not come within the terms of Art. III. Although the probation-violation charge might be based on the commission of a criminal offense, it does not result in the probationer's being "prosecuted" or "brought to trial" for that offense. Indeed, in the context of the Agreement, the probation-violation charge generally will be based on the criminal offense for which the probationer already was tried and convicted and is serving his sentence in the sending State.

Nor, of course, will the probationer be "prosecuted" or "brought to trial" on the criminal offense for which he initially was sentenced to probation, since he already will have been tried and convicted for that offense. Instead, the probation-violation charge results in a probation-revocation hearing, a

proceeding to determine whether the conditions of probation should be modified or the probationer should be re-sentenced, at which the probationer is entitled to less than the full panoply of due process rights accorded a defendant at a criminal trial. See *Gagnon* v. *Scarpelli*, 411 U. S. 778 (1973). Cf. *Morrissey* v. *Brewer*, 408 U. S. 471 (1972) (parole-revocation hearing).

Respondent contends that Art. III applies to more than just criminal charges, relying principally on the language of Art. I, which provides: "The party States find that *charges outstanding against a prisoner,* detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation." (Emphasis added.) According to respondent, this language indicates that the drafters intended the Agreement to apply, literally, to all "charges outstanding against a prisoner," including a probation-violation charge. However, when this language, which appears in the legislative declaration of purpose, is read in the context of the operative language of Arts. III and V discussed above, it is clear that the drafters meant the term "charges" to refer to criminal charges.[4]

We therefore conclude from the language of the Agreement that a detainer based on a probation-violation charge is not a detainer based on "any untried indictment, information or complaint," within the meaning of Art. III.

B

The legislative history of the Agreement does not persuade us to depart from what appears to be the plain language of the Agreement. Respondent relies principally on the follow-

---

[4] Even if the term "charges" in Art. I were interpreted to refer to all charges, under normal rules of statutory construction the specific language of Art. III would control over the general language of Art. I.

ing passage from comments made by the Council of State Governments, which drafted the Agreement:

> "A detainer may be defined as a warrant filed against a person already in custody with the purpose of insuring that he will be available to the authority which has placed the detainer. Wardens of institutions holding men who have detainers on them invariably recognize these warrants and notify the authorities placing them of the impending release of the prisoner. Such detainers may be placed by various authorities under varying conditions, for example, when an escaped prisoner or *a parolee commits a new crime and is imprisoned in another state;* or where a man not previously imprisoned commits a series of crimes in different jurisdictions." Suggested State Legislation, Program for 1957, p. 74 (emphasis added).

This passage is the introductory paragraph of the Council's discussion of the suggested legislation. It was intended to provide a general definition of detainers and a brief description of how they might arise. The italicized passage suggests that some detainers arise from parole-violation charges, a fact not in dispute here. By its terms, however, Art. III does not apply to all detainers, but only to those based on "any untried indictment, information or complaint."[5] The above passage does not illuminate, or purport to illuminate, the scope of this phrase.

Indeed, if the above passage were interpreted to define the scope of Art. III, it would lead to the conclusion that Art. III applies to *parole*-violation detainers. This conclusion is difficult to reconcile with the procedures established by the Agreement. In particular, the prisoner invokes Art. III by "caus[ing] to be delivered *to the prosecuting officer*

---

[5] For example, Art. III clearly does not apply to a detainer based on an additional sentence already imposed against the prisoner.

*and the appropriate court of the prosecuting officer's juris-diction* written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint." (Emphasis added.) This notification mechanism is efficacious in the case of criminal-charge detainers, but not in the case of parole-violation detainers, because prosecutors and judges generally are not involved in parole-revocation proceedings. If the drafters of the Agreement had intended Art. III to apply to parole-violation detainers, they likely would have devised a more appropriate notification mechanism. Furthermore, Art. III(d) provides that if the prisoner is returned to the original place of imprisonment without being tried on any indictment, information, or complaint, "the *court* shall enter an order dismissing the [indictment, information, or complaint] with prejudice." Similarly, Art. V(c) provides that if the prisoner is not brought to trial within the period provided in Art. III, *"the appropriate court of the jurisdiction* where the indictment, information or complaint has been pending shall enter an order dismissing the same with prejudice." (Emphasis added.) It is difficult to understand how these provisions would apply in the context of parole-violation charges, which generally are issued and adjudicated by a parole board or similar administrative agency, and are not "pending" in any court.

We therefore conclude that the reference to parolees in the comments of the Council of State Governments does not support the inference that in drafting the Agreement the Council intended the scope of Art. III to include detainers based on parole- or probation-violation charges.

In contrast to the legislative history created by the Council of State Governments, which does not directly address the precise issue in this case, the congressional legislative history indicates that Congress, which adopted the Agreement in 1970, see Pub. L. 91–538, 84 Stat. 1397, considered the Agreement to apply only to detainers based on untried crimi-

nal charges.   The Court noted in *United States* v. *Mauro*, 436 U. S., at 359, and in *Cuyler* v. *Adams*, 449 U. S., at 436, n. 3, that the House and Senate Reports on the Agreement explain: "A detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending *criminal charges* in another jurisdiction."   H. R. Rep. No. 91–1018, p. 2 (1970); S. Rep. No. 91–1356, p. 2 (1970) (emphasis added).   The congressional Reports also contain references to the prisoner's being "convicted on the new charges."   H. R. Rep. No. 91–1018, at 2; S. Rep. No. 91–1356, at 2.   In addition, Senator Hruska stated in the congressional debates on the Agreement: "At the heart of this measure is the proposition that a person should be entitled to have *criminal charges* pending against him determined in expeditious fashion."   116 Cong. Rec. 38840 (1970) (emphasis added).

## C

As noted, the Court of Appeals said its decision was based not on "a technical interpretation of the relevant language of Art. III," 739 F. 2d, at 883, nor on any statements in the legislative history addressing the specific issue in this case, but rather on "the broader purposes of the legislation," *id.,* at 882.   We do not find that these purposes compel the conclusion that, contrary to the plain language of the Agreement, Art. III was intended to apply to probation-violation detainers.

Adoption of the Agreement was motivated in part by a practice of filing detainers based on untried criminal charges that had little basis.[6]   These detainers often would be with-

---

[6] One commentator has noted:

"Since the legal basis for a detainer is rarely examined, a prisoner can suffer loss of privileges and parole because of a charge for which there is not sufficient proof to obtain an indictment.   Undoubtedly, detainers are sometimes used by prosecutors to exact punishment without having to try

drawn shortly before the prisoner was released.[7] Even though unsubstantiated, the detainers would have a detrimental effect on the prisoner's treatment.[8] Article III enables a prisoner to require the State lodging the detainer either to drop the charge and resulting detainer or to bring the prisoner to trial. In this way, the prisoner can clear his record of detainers based on unsubstantiated charges.

A probation-violation detainer, however, generally, as in the present case, will be based on the prisoner's commission of the crimes that resulted in his conviction and incarceration

---

a charge which they feel would not result in a conviction." Note, Detainers and the Correctional Process, 1966 Wash. U. L. Q. 417, 423 (footnote omitted).

See also *United States* v. *Mauro*, 436 U. S. 340, 358, and n. 25 (1978) (noting that, because of the informality of the detainer system, detainers may be filed groundlessly or even in bad faith). The congressional Reports note that the Agreement provides the prisoner "with a procedure for bringing about a prompt test of the substantiality of detainers placed against him by other jurisdictions." H. R. Rep. No. 91–1018, p. 2 (1970); S. Rep. No. 91–1356, p. 2 (1970).

[7] According to the congressional Reports, "a majority of detainers filed by States are withdrawn near the conclusion of the Federal sentence." H. R. Rep. No. 91–1018, at 3; S. Rep. No. 91–1356, at 3.

[8] The United States Court of Appeals for the Eighth Circuit has described these effects as follows:

"[T]he inmate is (1) deprived of an opportunity to obtain a sentence to run concurrently with the sentence being served at the time the detainer is filed; (2) classified as a maximum or close custody risk; (3) ineligible for initial assignments to less than maximum security prisons (i. e., honor farms or forestry camp work); (4) ineligible for trustee *[sic]* status; (5) not allowed to live in preferred living quarters such as dormitories; (6) ineligible for study-release programs or work-release programs; (7) ineligible to be transferred to preferred medium or minimum custody institutions within the correctional system, which includes the removal of any possibility of transfer to an institution more appropriate for youthful offenders; (8) not entitled to preferred prison jobs which carry higher wages and entitle [him] to additional good time credits against [his] sentence; (9) inhibited by the denial of possibility of parole or any commutation of his sentence; (10) caused anxiety and thus hindered in the overall rehabilitation process since he cannot take maximum advantage of his institutional opportunities." *Cooper* v. *Lockhart*, 489 F. 2d 308, 314, n. 10 (1973).

in the sending State.[9]  Because the convictions conclusively establish the probation violation, see *Morrissey* v. *Brewer*, 408 U. S., at 490 (parole revocation hearing), the probation-violation charge will not be unsubstantiated.  Thus, the abuses that in part motivated adoption of the Agreement generally do not occur in the context of probation-violation detainers.

The Agreement generally seeks "to encourage the expeditious and orderly disposition of [outstanding] charges,"[10] as

---

[9] See Brief for University of Virginia School of Law Post-Conviction Assistance Project as *Amicus Curiae* 30–31 ("[I]n most cases the conviction for which the prisoner is serving a sentence will be conclusive proof of the violation").  Although a probation-violation detainer initially might be based on an arrest, the probationer cannot invoke Art. III until he "has entered upon a term of imprisonment in a penal or correctional institution of a party State"—that is, until he has been convicted of the offense in the sending State and commenced to serve his sentence there.

[10] The Court of Appeals suggested that the Agreement serves "to vindicate a prisoner's constitutional right to a speedy trial," 739 F. 2d, at 883, but noted that this purpose is "not usually relevant when probation violations are involved." *Id.*, at 882.  Some 13 years after the Agreement was drafted, this Court ruled that the Sixth Amendment right to a speedy trial entitles a prisoner in a federal penitentiary who is subject to pending state criminal charges to have the State, upon demand, make a diligent, good-faith effort to bring him to trial within a reasonable time. *Smith* v. *Hooey*, 393 U. S. 374 (1969).  The congressional Reports discuss *Smith* v. *Hooey* and explain that enactment of the Agreement by Congress "would afford defendants in criminal cases the right to a speedy trial and diminish the possibility of convictions being vacated or reversed because of a denial of this right." S. Rep. No. 91–1356, at 2.  See also H. R. Rep. No. 91–1018, at 1–2; 116 Cong. Rec. 14000 (1970) (remarks of Rep. Poff); *id.*, at 38840 (remarks of Sen. Hruska).  Thus, Congress, at least, enacted the Agreement in part to vindicate a prisoner's constitutional right to a speedy trial. This Court has never held, however, that a prisoner subject to a probation-violation detainer has a constitutional right to a speedy probation-revocation hearing.  Cf. *Moody* v. *Daggett*, 429 U. S. 78 (1976) (a prisoner in a federal penitentiary who is subject to a federal parole-violation detainer is not constitutionally entitled to a prompt parole-revocation hearing).  Thus, as the Court of Appeals suggested, it is not clear that the purpose of vindicating a prisoner's constitutional right to a speedy trial is applicable at all in the context of probation-violation detainers.

well as the prompt "determination of the proper status of any and all detainers based on untried indictments, informations or complaints," in order to eliminate "uncertainties which obstruct programs of prisoner treatment and rehabilitation." Art. I. The uncertainties associated with probation-violation detainers, however, are less severe than the uncertainties associated with criminal-charge detainers. See Dauber, Reforming the Detainer System: A Case Study, 7 Crim. L. Bull. 669, 680 (1971) (parole- and probation-violation detainers involve less uncertainty than criminal-charge detainers). As noted above, in general the factual issue of guilt of the probation violation is conclusively established by the convictions leading to incarceration in the sending State. Disposition of the probation-violation charge underlying a detainer therefore often will result in probation being revoked and in the probationer's being resentenced to imprisonment in the receiving State. See *Moody* v. *Daggett*, 429 U. S., at 89 (parole violation); L. Abramson, Criminal Detainers 64–65, 81 (1979). The ultimate consequence is that the detainer based on the probation-violation charge merely will be replaced by a detainer based on the reimposed sentence, with similar adverse effects on the prisoner's treatment and rehabilitation. See Dauber, *supra*, at 678–679. Since the probation revocation is based on commission of a crime serious enough to warrant incarceration in the sending State, the probationer no doubt often, as in the present case, will be sentenced to serve the full term of his suspended sentence. Thus, the uncertainties in the underlying charge, in the likelihood of the prisoner's receiving an additional sentence, and in the length of incarceration generally are less in the case of probation-violation detainers than in the case of criminal-charge detainers. Moreover, because the prisoner may not relitigate the factual issue of guilt of the probation-violation charge when it is established by a conviction in the sending State, see *Morrissey* v. *Brewer*, 408 U. S., at 490, the "most serious," see *Barker* v. *Wingo*, 407 U. S. 514, 532 (1972), of

the interests of the accused in obtaining a speedy disposition of outstanding criminal charges—the interest in "'limit[ing] the possibilities that long delay will impair [his] ability . . . to defend himself,'" *Smith* v. *Hooey*, 393 U. S. 374, 378 (1969), quoting *United States* v. *Ewell*, 383 U. S. 116, 120 (1966)—is unlikely to be strongly implicated in the probation-violation detainer context.

Indeed, it often may be desirable to delay rather than to expedite disposition of the probation-violation charge. As the Court explained in *Moody* v. *Daggett*, 429 U. S. 78 (1976), in the context of parole violations:

> "[I]n cases such as this, in which the parolee admits or has been convicted of an offense plainly constituting a parole violation, the only remaining inquiry is whether continued release is justified notwithstanding the violation. This is uniquely a 'prediction as to the ability of the individual to live in society without committing anti-social acts.' *Morrissey, supra,* at 480. In making this prophecy, a parolee's institutional record can be perhaps one of the most significant factors. Forcing decision immediately after imprisonment would not only deprive the parole authority of this vital information, but since the other most salient factor would be the parolee's recent convictions, . . . a decision to revoke parole would often be foreordained. Given the predictive nature of the hearing, it is appropriate that such hearing be held at the time at which prediction is both most relevant and most accurate—at the expiration of the parolee's intervening sentence." *Id.,* at 89.

Of course, the decision whether to request expeditious disposition lies with the prisoner, and there are circumstances under which the prisoner may have a legitimate interest in obtaining prompt disposition of a probation-violation charge underlying a detainer. For example, the prisoner may believe that he can present mitigating evidence that will lead to

a decision not to revoke probation. Alternatively, he may hope for the imposition of a concurrent sentence. Finally, he simply may prefer the certainty of a known sentence to the relative uncertainty of a pending probation-violation charge.

Nevertheless, as discussed above, the purposes of the Agreement are significantly less advanced by application of Art. III to probation-violation detainers than by application of Art. III to criminal-charge detainers. Whether those purposes would be advanced sufficiently by application of Art. III to probation-violation detainers to outweigh the administrative costs, and, more generally, whether the procedures of Art. III are the most appropriate means of disposing of probation-violation detainers,[11] are questions of legislative judgment that we must leave to the parties to the Agreement. Given the plain language of the Agreement and the relevant legislative history, we cannot conclude on the basis of the stated purposes of the Agreement alone that the parties to the Agreement intended Art. III to apply to probation-violation detainers. Accordingly, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE STEVENS join, dissenting.

Must detainers based on outstanding charges of probation violation be disposed of within the terms of the Interstate Agreement on Detainers when such disposition is requested? Article III of the Agreement permits an inmate to invoke his rights to speedy detainer disposition by making a "request for final disposition of all untried indictments, informations or complaints on the basis of which detainers have been lodged."

---

[11] We note that some commentators have recommended, in light of the differences between probation-violation charges and criminal charges, that procedures different from those of Art. III be adopted for resolving probation-violation charges underlying detainers. See, *e. g.,* L. Abramson, Criminal Detainers 81–83 (1979); Dauber, Reforming the Detainer System: A Case Study, 7 Crim. L. Bull. 669, 704–705 (1971).

N. J. Stat. Ann. §2A:159A–3 (West 1971) (hereinafter cited by Article only). No interpretive rule that I am aware of requires that "complaints" cannot subsume charges of probation violation, and no available legislative history indicates an intention to exclude detainers based on such charges from the Agreement. Instead, the drafters plainly intended a comprehensive solution for the problem of detainers, and the Court itself acknowledges that underlying purposes of the Agreement would be "advanced" if probation-violation detainers were subject to its strictures. *Ante,* at 733–734. Article IX of the Agreement directs that "[t]his Agreement shall be liberally construed so as to effectuate its purposes," and the Council of State Governments, original author of the Agreement some 30 years ago, still agrees.[1] Nevertheless, without mention of Article IX, the Court holds that the Agreement does not apply to probation-violation detainers. I respectfully suggest that, in so holding, the Court constructs an artificial "plain language" argument that assumes its conclusion, vitiates the Agreement in significant measure, and reverses the rationale of our other major precedent construing the Agreement, *United States* v. *Mauro,* 436 U. S. 340 (1978). Accordingly, I dissent.

I

Prior to expiration of his 2-year New Jersey probationary term, respondent Richard Nash was arrested in Pennsylvania. Upon learning of this, his probation department in New Jersey notified the New Jersey Superior Court of Nash's probable probation violation,[2] and the Superior Court

---

[1] "Since the [Agreement] is remedial in character, it should be construed liberally in favor of the prisoner." Council of State Governments, Handbook on Interstate Crime Control 134 (1978 ed.). See also *Cuyler* v. *Adams,* 449 U. S. 433, 449 (1981) ("The remedial purpose of the Agreement supports an interpretation that gives prisoners [a hearing] right").

[2] This notification took the form of a 1-page untitled memorandum from a probation officer to a Mercer County Superior Court judge, reciting that Nash had been arrested in Pennsylvania and that his "offenses [obviously

ordered that "a Bench Warrant be issued as a DETAINER." Supp. Record 3. This document was then lodged with corrections officials having custody of Nash in Pennsylvania.

The Pennsylvania officials, the New Jersey officials and courts, and Nash all treated the detainer as subject to the provisions of the Agreement. Upon its receipt, Pennsylvania notified Nash of his rights to dispose of the detainer under the Agreement. Nash then contacted New Jersey officials and requested disposition of the detainer under the Agreement, and the New Jersey officials attempted to comply with the Agreement's requirements. The New Jersey state courts reviewed Nash's case as one involving a "complaint" under Article III of the Agreement, see n. 2, *supra*, and the Federal District Court in New Jersey ruled that New Jersey's failure to comply with the time limits of the Agreement required dismissal of the New Jersey probation-violation charges. 558 F. Supp. 641, 651 (1983).

## II

In *Mauro, supra,* we stated that when "the purposes of the Agreement and the reasons for its adoption" are implicated, there is simply "no reason to give an unduly restrictive

---

as yet unproven] constitute a Violation of Probation." Supp. Record 6. The New Jersey Superior Court explicitly characterized this document as a "probation violation *complaint*." App. to Pet. for Cert. in No. 84–776, p. 55 (emphasis added). The Court ignores this characterization, as well as the question of what the result would be under its "plain language" analysis if any signatory States routinely so labeled charges of probation violation. I do not believe the argument should turn on such labels. See n. 16, *infra.*

Probationers in New Jersey are charged with knowledge that commission of further crimes while on probation is an automatic violation under New Jersey law. *State* v. *Zachowski,* 53 N. J. Super. 431, 437, 147 A. 2d 584, 588 (1959); cf. N. J. Stat. Ann., § 2C:45–3(a)(2) (West 1982) (warrant may be issued on probable cause that probationer "has committed another offense"). Whether or not the probation-violation complaint and consequent detainer had an adequate basis when issued in this case is not before us.

meaning" to the Agreement's terms. 436 U. S., at 361–362; accord, *Cuyler* v. *Adams*, 449 U. S. 443, 448–450 (1981) (looking to purposes of the Agreement in light of Article IX's "liberal construction" rule). It is therefore necessary to review the purposes underlying the Interstate Agreement on Detainers and how they relate to detainers based on charges of probation violation.

Three distinct goals generated the drafting and enactment of the Agreement: (1) definitive resolution of potential terms of incarceration so that prisoners and prison administrators can know with certainty when a prisoner is likely to be released, (2) speedy disposition of detainers to ensure that those filed for frivolous reasons do not linger, and (3) reciprocal ease for signatory States to obtain persons incarcerated in other jurisdictions for disposition of charges of wrongdoing, thereby superseding more cumbersome extradition procedures. See generally *Cuyler*, *supra*, at 446–450; *Mauro*, *supra*, at 359–364; Council of State Governments, Suggested State Legislation, Program for 1957, pp. 74–79 (1956) (hereinafter CSG Report). Noting that the Agreement was motivated "in part" by the second purpose—speedy disposition of detainers based on possibly unsubstantiated criminal charges—the Court places far too much emphasis on this purpose which is obviously the least relevant to detainers based on charges stemming from conviction for new criminal conduct.[3]

---

[3] Although the Court's conclusion apparently extends to detainers based on any type of probation-violation charge, its discussion refers only to probation violations founded on a new criminal conviction. Of course, probation-violation detainers may easily be based on arrests alone, as was the detainer in this case, or on charges of "technical" violations, the validity of which cannot be so easily presumed. See, *e. g.*, N. J. Stat. Ann., § 2C:45–1(b) (West 1982) (conditions of probation may include "meet-[ing] . . . family responsibilities," maintaining employment, continuing medical or psychiatric treatment, "pursu[ing] a prescribed . . . course of study," "refrain[ing] from frequenting unlawful or disreputable places or consorting with disreputable persons," etc.). Nevertheless, I am willing to concede, *arguendo*, that many probation-violation detainers are based

It is unarguable that a major motivating force behind the Agreement was the first listed above: disposition of unresolved detainers so as to produce sentences of determinate length, so that in-prison programming and rehabilitation could freely occur.[4] Because in-prison educational, vocational, rehabilitation, and other treatment programs are generally (1) overcrowded and (2) designed for inmates who will

---

upon criminal convictions in another jurisdiction. I will also assume that "'uncertainties'" concerning "the factual issue of guilt" are therefore "less severe" with regard to probation-violation than outstanding-criminal-charge detainers, *ante*, at 732, although the high rate of conviction for most criminal prosecutions suggests the differences are less real than the Court imagines. Both these assumptions are necessary for the Court to dismiss the second purpose of the Agreement as being "less advanced" in the probation-violation context. *Ante*, at 734.

The Court also employs its "factual issue of guilt" argument to dismiss the interest in obtaining speedy disposition of detainers so as not to impair a prisoner's possible defense, which it finds not as "strongly" implicated in the probation-violation context. *Ante*, at 732–733. Of course, this dismissal also depends on the dual assumptions that all probation-violation charges will be based on criminal convictions, and that they therefore carry greater inherent substantiation. Even if all these assumptions were true, however, the Court's conclusion still does not take proper account of the other goals of the Agreement.

[4] A detainer is defined by the drafters of the Agreement as any "warrant filed against a person already in custody with the purpose of insuring that he will be available to the authority which has placed the detainer" after his current custody is terminated. CSG Report 74. Because detainers often go unresolved for years, "[t]he prison administrator is thwarted in his efforts toward rehabilitation. The inmate who has a detainer against him is filled with anxiety and apprehension and frequently does not respond to a training program. He often must be kept in close custody, which bars him from treatment such as trustyships, moderations of custody, and opportunity for transfer to farms and work camps. In many jurisdictions he is not eligible for parole; there is little hope for his release after an optimum period of training and treatment . . . . Instead, he often becomes embittered . . . and the objective of the correctional system is defeated." *Ibid.* See Note, The Right to a Speedy Trial and the New Detainer Statutes, 18 Rutgers L. Rev. 828, 832 (1964) ("The thrust of [the Agreement] is not to protect the convict's right to a speedy trial per se, but rather to protect him from the particular disabilities engendered by an untried detainer pending against him").

shortly be released to the public world, prisoners that may be released only to another State's prisons are put at the end of the line for such programs. In addition, because prisoners facing longer sentences are believed to be greater escape risks, they are often held in stricter custody levels and denied various in-prison benefits (such as recreational and work-release programs and trusty status). In some States prisoners with detainers may even be denied parole that they would otherwise receive, on the theory that a prisoner cannot be "paroled into" another prison.[5] Thus *any* "charges outstanding" against prisoners that might result in additional incarceration create "uncertainties" that "obstruct programs of prisoner treatment and rehabilitation." Art. I.[6] This

---

[5] The deleterious effects of detainers are well recognized and recitation of authority is superfluous. A helpful summary may be found in Wexler & Hershey, Criminal Detainers in a Nutshell, 7 Crim. L. Bull. 753 (1971): "As has been carefully documented elsewhere, a prison inmate with a detainer filed against him . . . may suffer several disabilities, ranging from mandatory maximum-security classification to exclusion from vocational rehabilitation programs and even to possible ineligibility for parole." See also N. Cohen & J. Gobert, The Law of Probation and Parole § 12.01, pp. 562–563 (1983); L. Abramson, Criminal Detainers 29–34, 85–87 (1979); Bennett, "The Last Full Ounce," 23 Fed. Prob. 20 (June 1959); 9 Fed. Prob. 1 (July–Sept. 1945) (entire issue devoted to "the detainer and its evils").

[6] The Court seriously misunderstands what "uncertainties" the Agreement is designed to resolve. It is an uncertain *length of incarceration*, not an uncertain basis for charges, that is "produced" by a detainer and "obstructs" rehabilitation. Cf. *ante*, at 732 (discussing only uncertainties related to the "factual issue of guilt"). Prison officials generally do not inquire whether the basis for a detainer is certain or flimsy—if it suggests a possibility of additional incarceration, whether for violation of parole or for conviction of a new crime, it is considered as an additional factor in determining the inmate's security level and programming options. See, *e. g.*, Dept. of Justice, Federal Prison System, Program Statement No. 5100.2, §§ 9(B)(1), 11(A)(1) (1982). The Agreement obviously does not eliminate detainers, but merely provides the means for definitive resolution and imposition of a certain, final sentence. "The result is to permit the prisoner to secure a greater degree of certainty as to his future and to enable the prison authorities to plan more effectively for his rehabilitation and return to society." S. Rep. No. 91–1356, p. 2 (1970).

statement in Article I represents the legislative findings of 48 States and Congress. It is, therefore, those legislative bodies, and not merely the prisoner, who "prefer the certainty of a known sentence to the relative uncertainty of a pending probation-violation charge." *Ante*, at 734.

Even if a detainer is withdrawn near the end of a prisoner's term, he will have been denied the benefits of less strict custody and will be released to the streets without the education, job training, or treatment he might otherwise have received. It is therefore undisputed that prisoners with unresolved detainers are embittered not only because those detainers may have little basis in fact, but also because they have a palpably punitive effect on the prisoner's life while in prison and on his rehabilitative future following release.[7]

Prosecutors know full well that a detainer can operate to deny prisoners substantial in-prison benefits and programs, as well as delay their eventual release. Thus, as the Court acknowledges, detainers are often filed with "little basis" in order to "'exact punishment'" impermissibly, and are often "withdrawn shortly before" release of the prisoner after the damage has been done. *Ante*, at 729–730, n. 6.[8] The evident lawlessness of such practices as well as their disruptive effect on rehabilitation motivated adoption of the Agreement, *ibid.*,

---

[7] "It is in their effect upon the prisoner and our attempts to rehabilitate him that detainers are most corrosive." *Smith* v. *Hooey*, 393 U. S. 374, 379 (1969) (citation and stylistic punctuation omitted).

[8] As Congress noted when it joined the Agreement: "[W]ithdrawal at this late stage is of dubious benefit. The damage to the rehabilitative process has been done because by then the period of treatment and training has ended. Further, this situation precludes the institutional staff from developing a well-planned program upon release." S. Rep. No. 91–1356, *supra*, at 5. See also Bennett, The Correctional Administrator Views Detainers, 9 Fed. Prob. 8, 9 (July–Sept. 1945) ("It is . . . pointless to spend funds for the training of an inmate if he is merely to be graduated to another institution"); Heyns, The Detainer in a State Correctional System, 9 Fed. Prob. 13 (July–Sept. 1945) ("[N]o State correctional agency can plan a sound program of rehabilitation for an inmate so long as he must keep answering detainers").

in order, in large part, to end uncertainty regarding release dates. See Council of State Governments, Handbook on Interstate Crime Control 116 (1978 ed.) (the Agreement is designed "to permit the prisoner to secure a greater degree of knowledge of his own future and to make it possible for the prison authorities to provide better plans and programs for his treatment").

Obviously, a detainer based on a charge of probation violation implicates these rehabilitative concerns of the Agreement to the same extent as do detainers based on outstanding criminal charges. Accord, N. Cohen & J. Gobert, The Law of Probation and Parole § 12.02, p. 566 (1983) ("[T]he policies underlying [the Agreement] apply equally well to prisoners subject to a detainer based on a probation or parole violator warrant"). Both types of detainers may result in terms of additional incarceration, yet both types can also result in no additional time. Just as judges normally are permitted to impose an original sentence of brief or no incarceration, they also have broad discretion when resentencing for probation violations as to any subsequent term of imprisonment.[9]

---

[9] New Jersey's laws are typical. Upon finding a probation violation, the court "may impose on the defendant any sentence that might have been imposed originally for the offense for which he was convicted." N. J. Stat. Ann., § 2C:45–3(b) (West 1982). Any sentence imposed may be ordered to run concurrently with or consecutively to any sentence the inmate is serving. § 2C:44–5 (West Supp. 1984–1985). Even revocation is not automatic despite a proven violation. § 2C:45–3(a)(4) (court "may" revoke probation upon finding a violation). Similar guidelines apply to parole-violation resentencing. See N. J. Stat. Ann. §§ 30:4–123.60–123.65 (West 1982). See also The National Advisory Commission on Criminal Justice Standards and Goals, Corrections, Standard 5.4(5) (1973) (upon revocation of parole for new criminal conviction, resentencing decisions should be governed by the same "criteria and procedures [that] gover[n] initial sentencing decisions"); see generally Cohen & Gobert, The Law of Probation and Parole § 15; id., p. 646 ("Most jurisdictions" provide judges with "a vast array of possible sanctions to impose after a revocation").

In light of such broad grants of discretion, the Court's assertion, offered with no citation of supportive authority, that "probationer[s] no doubt

Thus certainty regarding the "factual issue of guilt" of the charge, *ante*, at 732, is irrelevant to the uncertainty of the incarceration term. For this reason, the first listed purpose of the Agreement, certainty regarding length of incarceration, is "fully implicated," *Mauro*, 436 U. S., at 362, by detainers based on charges of probation violation, and "the very problems with which the Agreement is concerned," *ibid.*, are present.

The result of such analysis in *Mauro* is instructive. In that case we concluded that the phrase "written request for temporary custody" in Article IV was sufficiently broad to accommodate a writ of habeas corpus *ad prosequendum* from the Federal Government to a State, even though such a writ is (as the dissent noted) in effect a command which state officials have no discretion to ignore. *Id.*, at 361–364; see *id.*, at 366 (REHNQUIST, J., dissenting). We rejected just the sort of semantic formalism practiced by the Court today, which virtually echoes the *Mauro* dissent.[10] A "narrow reading" of the term "request" was inappropriate because nothing in the Agreement's history required it, and "[a]ny other reading of this section would allow the Government to gain the advantages of lodging a detainer against a prisoner without assuming the responsibilities that the Agreement intended to arise from such an action." *Id.*, at 364 (footnotes omitted).

*Mauro's* rationale does not require that the terms of the Agreement be thrown to the winds whenever an inmate

---

often . . . will be sentenced to serve the full term of [their] suspended sentence[s]," *ante*, at 732, is surprising as well as speculative.

[10] In *Mauro*, JUSTICE REHNQUIST criticized the Court for basing its decision on the purposes of the Agreement, and suggested instead that the Court should have "*first* turn[ed] to the language of the [Agreement] before resorting to such extra-statutory interpretive aids." 436 U. S., at 366 (dissenting) (emphasis in original). Cf. *ante*, at 733–734 (although purposes of the Agreement would be "advanced" by application to probation-violation detainers, in light of the "plain language" of the Agreement "we cannot conclude on the basis of the stated purposes . . . alone" that such a result is required).

comes up with a plausible policy argument for the Agreement's application—obviously the Agreement cannot be judicially rewritten if its present language cannot accommodate probation-violation detainers. But, as we also noted in *Cuyler*, 449 U. S., at 449–450, consideration of the "purpose, . . . structure, . . . language, and its legislative history" is necessary before reaching a final interpretation of the Agreement's terms. *Mauro* plainly counsels against miserly interpretation of the words when the purposes of the Agreement are implicated, as they undeniably are here.[11] These precedents and the Agreement's purposes must be kept in mind as one turns to the Court's argument that the Agreement's "plain language" cannot accommodate detainers based on charges of probation violation.

## III

Literally applied, the "plain language" of the Agreement, *ante*, at 726, 734, would place far more restrictions on the Agreement's operation than the Court admits. For example, Article III states that a prisoner who makes a final disposition request "shall be brought to trial within 180 days," and provides that "[i]f trial is not had . . . prior to the return of the prisoner . . . the court shall enter an order dismissing" the

---

[11] "When 'interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such construction as will carry into execution the will of the Legislature . . . .' *Brown* v. *Duchesne*, 19 How. 183, 194 (1857)." *Kokoszka* v. *Belford*, 417 U. S. 642, 650 (1974). See also 2A C. Sands, Sutherland on Statutory Construction § 46.07 (4th ed. 1984) ("The literal interpretation of the words of an act should not prevail if it creates a result contrary to the intention of the legislature"). Even if this were not already a "well-established canon of statutory construction," *Bob Jones University* v. *United States*, 461 U. S. 574, 586 (1983), in this case the law itself directs us to apply its terms "liberally . . . so as to effectuate its purposes." Art. IX.

underlying charges. Obviously, however, neither the Court nor common sense would require that a prisoner returned on a detainer and convicted on a plea of guilty or diverted into a pretrial probation plan could obtain an Article III dismissal because he had had no "trial."[12] The term "trial" is plainly used in the Agreement to represent the broader concept of "final disposition"—indeed, Article III uses the terms interchangeably. See also *ante*, at 733 (noting interest in obtaining "speedy *disposition* of outstanding criminal charges") (emphasis added).

Similarly, the terms "indictment, information or complaint," strictly construed, would not encompass the varied types of documents used by some signatory States to initiate the criminal process. Virginia, for example, has a practice whereby criminal charges may be lodged with the court by a grand jury without involvement of a prosecutor. Va. Code § 19.2–216 (1983). The resulting document is called a "presentment" and, as petitioners admitted at oral argument, a "presentment" would not fall within their "plain language" interpretation of the Agreement. Tr. of Oral Arg. 10; see Brief for University of Virginia School of Law Post-Conviction Assistance Project as *Amicus Curiae* 13–14. Yet detainers based on presentments are, for purposes of the Agreement, no different from those based on indictments or informations. The Court therefore properly rejects *this* "plain language" argument, "interpret[ing]" the phrase "indictment, information or complaint" to encompass all "documents charging an individual with having committed a criminal offense." *Ante*, at 724.

Once the Court recognizes, albeit silently, the propriety of such interpretive efforts, its continued reliance on a strict "plain language" argument cannot persuade. Nash's argu-

---

[12] Thus, just as a probation-violation charge "does not result in the probationer's being . . . 'brought to trial,'" *ante*, at 725, neither necessarily does an outstanding criminal charge.

ment is that the Agreement was designed to deal comprehensively with the problems caused by detainers of all kinds, and that "complaint" is a general term used to encompass any type of "charges outstanding against a prisoner," Art. I, that might form the basis for a detainer. No rule of language precludes such a conclusion. In general usage, "complaint" is defined as, *inter alia*, any "utterance expressing a grievance." Webster's New International Unabridged Dictionary 546 (2d ed. 1957). Even if restricted to its legal usage, "complaint" has been, since at least 1949 when the Federal Rules were amended, a sweeping generic term, applicable in both civil and criminal proceedings and encompassing "every action" that possibly can be filed in federal court, thereby superseding all "technical forms of pleading." Fed. Rules Civ. Proc. 1, 3, and 8(e)(1); Fed. Rule Crim. Proc. 3. Nothing in the Agreement or its legislative history indicates that "complaint" was used to *exclude* any particular type of detainer, or that its meaning was intended to be determined by its usage in only one context. Yet the Court looks only to the Federal Rules of Criminal Procedure for its definition of "complaint." *Ante*, at 724. Neither does any rule of statutory construction require the conclusion that "complaint" as used in Article III must be a more specific term than "charges" as used in Article I; indeed, one would think that construing the Agreement as a whole would require that these terms be read as coextensive rather than conflicting. But cf. *ante*, at 726, n. 4. Ultimately, no more than the fiat of a majority determines that "complaint" cannot include a probation-violation charge.

## IV

While I believe that the Court loses the semantic battle in these cases, I am much more seriously troubled by the Court's blind eye to relevant legislative history and the purposes of the Agreement, and the consequent vitiation of the Agreement itself. Detainers based on outstanding charges of criminal acts likely constitute only between one-half and

two-thirds of all detainers filed in our Nation's prisons.[13] The drafters of a uniform interstate statute would surely be surprised and disappointed to learn that their efforts had succeeded in dealing with perhaps only one-half of the problem they addressed.[14]

In fact, all the available evidence suggests that the Agreement was designed to "deal comprehensively" with the problem of detainers of all kinds;[15] significantly, the Court can

[13] The only reported statistical studies report that 46% and 44% of the detainers, respectively, in their concededly small samples were based on outstanding criminal charges. Dauber, Reforming the Detainer System: A Case Study, 7 Crim. L. Bull. 669, 676 (1971); Heyns, The Detainer in a State Correctional System, 9 Fed. Prob., at 15, n. 1. Detainers based on charges of probation or parole violation, on the other hand, made up, respectively, 19% and 44% of the samples. *Ibid.* See also Yackle, Taking Stock of Detainer Statutes, 8 Loyola (LA) L. Rev. 88, 89 (1975) (citing unpublished survey claiming that 69% of all detainers filed nationwide were based on outstanding criminal charges). The absence of comprehensive, recent data permits only rough generalizations, but it is certainly safe to say that restriction of the Agreement to only those detainers based on outstanding criminal charges leaves a substantial number of detainers beyond the protection of the Agreement. See Brief for Attorney General of Pennsylvania et al. as *Amici Curiae* 6, n. 4 (surmising that probation-violation detainers make up a "significant number" of all detainers).

[14] They might also be dismayed to discover that their third purpose—easing the administrative burdens of interstate prisoner transfer for signatory States—also stands partially frustrated by the Court's decision today. Once authorities have filed a detainer against a prisoner, Article IV of the Agreement enables them to obtain custody of that prisoner from another jurisdiction simply by filing a "written request for temporary custody." Article IV, however, also uses the phrase "indictment, information or complaint" to trigger its provisions. Thus any State that now desires to resolve probation-violation detainers in a timely manner will no longer have the option of using the Agreement, and will have to resort to the same unsatisfactory extradition procedures that originally motivated the States to draft and join the Agreement.

[15] Yackle, *supra*, at 94; see also L. Abramson, Criminal Detainers, at 94 ("[A]rticle I . . . declares that the IAD applies to all situations in which an inmate faces pending charges in another jurisdiction"). The title of the Agreement itself belies the Court's attribution of a less-than-

point to absolutely no affirmative indication that the drafters of the Agreement intended to exclude probation-violation detainers from its terms. As the Court acknowledges, Article I of the Agreement contains a "legislative declaration of purpose," *ante*, at 726, to reach "charges outstanding against a person," that is, "any and all detainers." The Court concedes the comprehensive scope of Article I, but sidesteps it by declaring that Article III *"does not apply to all detainers,* but only those based on 'any untried indictment, information or complaint.'" *Ante*, at 727 (emphasis added). The italicized phrase, however, merely assumes the conclusion. If the drafters of the Agreement did in fact intend to reach all detainers, as the evidence suggests, nothing in the general language of Article III requires a more restrictive reading.[16]

---

comprehensive legislative intent—we are not construing an Interstate Agreement on "Some" Detainers.

[16] The Court attempts to buttress its position by relying on two examples not presented in these cases. First, the Court recognizes that a comprehensive reading might require application of the Agreement to *parole-*violation detainers as well. Because Article III refers to "prosecuting officers" and "courts," and "because prosecutors and judges are generally not involved in parole revocation proceedings," language other than that currently found in Article III would have been, in the Court's view, "more appropriate" for this application. *Ante*, at 727–728. Of course, courts and prosecuting officers from probation departments *are* involved in probation-revocation proceedings, the only type of proceeding at issue here, so that these terms of Article III are perfectly well fulfilled in this case. More importantly, however, there is simply no reason that the terms of Article III could not accommodate disposition of parole-violation detainers, if they were applied a little less woodenly than the Court reads them. Just as "trial" in Article III must be interpreted as coextensive with the concept of "final disposition," so the other terms of Article III must be read "liberally," Art. IX, to accommodate the analogous roles that parole boards and probation officers play in the correctional system. Indeed, the New Jersey probation office, prosecutors, and courts in these cases made no objection to complying with the terms of Article III to dispose of Nash's probation-violation detainer.

The Court's second makeweight argument is that Article III "clearly **does** not apply to a detainer based on an additional sentence already im-

Although the terms of the Agreement were finally drafted in 1956 by the Council of State Governments, they were founded on a "statement of aims or guiding principles" drawn up in 1948. See CSG Report 74–75.[17] Those principles discuss "detainers" generally, without reference to their underlying basis, and the CSG Report declared in 1956 that those principles still "should govern the actions of prosecuting authorities, sentencing judges, prison officials *and parole authorities* to the end that detainers will not hamper the administration of correction programs and the effective rehabilitation of criminals." *Id.*, at 75 (emphasis added). Not even a suspicion that a third or more of all detainers might survive unaffected to "hamper" the correctional system is present here. Indeed, Principle III explicitly directs attention to detainers filed by nonprosecuting officials and thus not based on new criminal charges: "Prison and Parole authorities should take prompt action to settle detainers which have been filed *by them.*" *Ibid.* (emphasis added).

After reprinting these "govern[ing]" principles, the CSG Report went on to introduce three legislative proposals to "dea[l] with disposition of detainers," *id.*, at 76, including its Agreement on Detainers for application in the "interstate field." *Id.*, at 78. The CSG offered a statement of purpose for this particular proposal "by which a prisoner may initiate proceedings to clear a detainer placed against him from another jurisdiction," again without qualification: "The Agreement on Detainers makes the clearing of detainers possible." *Ibid.*

To my mind, it requires an impossible effort to imagine that the authors of these broad principles and unqualified

---

posed against the prisoner." *Ante*, at 727, n. 5. Of course it does not, but that is because such a detainer is *certain* and in no sense undisposed of or "untried."

[17] Significantly, the 1948 drafters included representatives from the Parole and Probation Compact Administrators Association. CSG Report 74.

statements of purpose, repeatedly referring to "parole" and relying on parole experts, somehow intended a less-than-comprehensive answer to the "problems in the detainer field." *Ibid.* Rather than attempt that effort, the Court simply ignores all this historical evidence of broad purpose. Presenting a single reference to parole-violation detainers as though it were the only such reference and then dismissing it as merely a "general definition," *ante,* at 726–727, the Court quickly retreats to its conclusion-assuming "plain language" argument. *Ibid.* At no point does the Court attempt to explain what rational intent might have motivated the Agreement's authors to draft only a partial solution without ever affirmatively so stating.[18]

---

[18] Because the Agreement is an interstate compact, its terms cannot be amended unilaterally by one or even several signatory jurisdictions. Thus the Court's reliance on Congress' 1970 description of "detainer" to support its conclusion about what the Agreement's 1957 terms may have meant, *ante,* at 728–729, is illegitimate; "post-passage remarks of legislators, however, explicit, cannot serve to change . . . legislative intent." *Regional Rail Reorganization Act Cases,* 419 U. S. 102, 132 (1974). It is entirely possible that late-joining jurisdictions might have different reasons for signing the Agreement, see, *e. g., ante,* at 731, n. 9 (Congress joined the Agreement in part to vindicate speedy trial rights), and even varying interpretations of the Agreement's terms. But such differences can in no way alter the original understanding that generated the particular terms as written. Indeed, New Jersey as well as 24 other States had already joined the Agreement by the time Congress considered the law. Subsequent narrowing of the terms by the remarks of federal legislators is thus particularly inappropriate in this case.

It should also be noted that Congress' discussion of detainers came in reaction to the decisions in *Smith* v. *Hooey,* 393 U. S. 374 (1969), and *Dickey* v. *Florida,* 398 U. S. 30 (1970), cases which involved detainers based on criminal charges. See S. Rep. No. 91–1356, at 1. The Council of State Governments provided a much more comprehensive definition when it proposed the Agreement. See n. 4, *supra.* The Court does not explain why this broad statement is dismissed as merely a "general definition," *ante,* at 726–727, while Congress' later and contextually specific discussion is relied upon to demonstrate intent, *ante,* at 728–729.

## V

We have recently noted that remedial statutes do not "take on straitjackets upon enactment." *Dowling* v. *United States, ante,* at 228. This should especially be true in the case of interstate compacts entered into by some 50 different legislative Acts and therefore much less amenable to subsequent amendment.[19] Much has changed since 1957 in the law of corrections; a probationer is now entitled to an in-person hearing before a term of incarceration is reimposed, *Gagnon* v. *Scarpelli,* 411 U. S. 778 (1973); see *Black* v. *Romano,* 471 U. S. 606, 612 (1985), and the rehabilitative ethic that motivated the Agreement has, for better or worse, been largely abandoned.[20] Thus timely disposition of probation-violation detainers now requires the expense of transportation for the prisoner to and from the charging jurisdiction,[21] while the re-

---

[19] Kentucky has in fact attempted to amend the Agreement to apply explicitly to probation- and parole-violation detainers. Ky. Rev. Stat. § 440.455(2) (1985). Kentucky's amendment expressly notes, however, that it can be "binding only . . . between those party states which specifically execute the same" amendment. § 440.455(1). Since no other State has enacted such an amendment, Kentucky's law has no effect and, after today's decision, the will of its legislature stands frustrated.

[20] See, *e. g.,* S. Rep. No. 98–225, p. 38 (1983) ("[T]oday, criminal sentencing is based largely on an outmoded rehabilitation model. . . . Yet almost everyone involved in the criminal justice system now doubts that rehabilitation can be induced reliably in a prison setting"); A. von Hirsch, Doing Justice: The Choice of Punishments xxxvii, 11–18 (1976); Bainbridge, The Return of Retribution, 71 ABA Journal 60 (May 1985). By comparison, in 1959 one of the framers of the Agreement, Director of the Federal Bureau of Prisons James V. Bennett, termed detainers "a vestigial remnant of the age-old concept of retributive justice. No purpose is served except the destructive expression of a primitive urge for vengeance." Bennett, "The Last Full Ounce," 23 Fed. Prob., at 20.

[21] See, *e. g., Padilla* v. *State,* 279 Ark. 100, 104, 648 S. W. 2d 797, 799 (1983) (Smith, J., concurring) (since probation-violation hearing would be "useless," reading Agreement to require transportation of prisoner from California and back for disposition of probation-violation detainer would be "holding the taxpayers of Arkansas for ransom").

habilitative benefits previously thought to accrue from such disposition are now discounted. Yet no one argues that an important remedial purpose of the Agreement as written—disposition of any detainer that could result in additional incarceration in order to produce certainty for in-prison programming—is not fully invoked by probation-violation detainers. In light of this fact, policy arguments that evidence only dissatisfaction with the Agreement's underlying purposes or chosen means are illegitimate, nonjudicial bases for decision.

Ultimately, the Court's decision rests on its conclusion that although the purposes of the Agreement are "advanced" when linked to probation-violation detainers, this is "significantly less" so than when the detainer is based on an outstanding criminal charge. *Ante*, at 734. Ignoring the bulk of the legislative history as well as the purpose of the Agreement to produce certainty described above, the Court defers instead to claims of "administrative costs" and paternalistic arguments regarding the "desirab[ility of] delay"[22] for pris-

_____

[22] As the Court acknowledges, a prisoner may well have "a legitimate interest in obtaining prompt disposition of a probation-violation charge." *Ante*, at 733. Although delaying disposition of a detainer may in some circumstances be desirable, the Agreement currently leaves the decision of whether to invoke its terms up to the prisoner. *Ibid.;* see Art. III (disposition required only after prisoner "cause[s] to be delivered" a request for final disposition). It is a cruel irony for the Court to note legitimate interests in prompt disposition at the same time it takes the choice away, for under the Court's result a prisoner will now be unable to dispose of a probation-violation detainer no matter how long it lingers or how frivolous its basis may be, unless the charging jurisdiction wants to do so. See Dauber, 7 Crim. L. Bull., at 680 (statistics indicate that "[p]arole and probation detainers . . . usually remain unresolved the longest"). As JUSTICE STEVENS noted in his dissent in *Moody* v. *Daggett*, 429 U. S. 78, 94, n. 8 (1976), "if a prisoner would rather face the uncertainty and restrictions which might occur because of an outstanding detainer in hopes that the [federal Parole] Commission would prove more lenient at a later revocation hearing, he could certainly waive his right" to prompt disposition.

oners. *Ante*, at 733–734.[23]  Thus Article IX is read out of the Agreement, and the rationale of *Mauro* is turned on its head.  Rather than determining whether the purposes of the Agreement can be achieved within a fair reading of its terms, the Court decides that if the "plain language" of the Agreement is amenable to a narrow reading, advancement of the Agreement's purposes is insufficient reason to apply its directives.  By this backwards reasoning the scope of the Agreement is now restricted to only two-thirds or less of all detainers.  Consequently, as would have been the case in *Mauro* had this Court not properly exercised its authority to construe federal law, prosecutors will once again be able to file certain detainers for little or no reason and "gain the advantages of lodging a detainer against a prisoner without assuming the responsibilities that the Agreement intended." 436 U. S., at 364 (footnotes omitted).

I respectfully dissent.

---

[23] Reference to such arguments, as well as to alternative language the Court would find "more appropriate" for the Agreement, *ante*, at 728, renders the Court's veiled criticism of the Court of Appeals' "policy analysis," *ibid.*, completely ineffective.  Indeed, *Mauro* and *Cuyler* indicate that such analysis *with regard to the policies of the Agreement* is entirely appropriate.