835 F.Supp. 585 (1993)
The STATE of NEW YORK, by Thomas A. COUGHLIN, III, and John P. Keane, Plaintiffs,
v.
Wellon B. POE, Larry Fields, Dan Reynolds, David A. Moss, and Thomas Joseph Grasso, Defendants.
No. 93-558-S.
United States District Court, E.D. Oklahoma.
October 8, 1993.
*586 Todd Hembree, Muskogee, OK, Robert Abrams, Edward M. Scher, Office of Atty. Gen., Albany, NY, for plaintiffs.
Susan Brimer Loving, Wellon B. Poe, Office of Atty. Gen., Oklahoma City, OK, for all defendants except Thomas Joseph Grasso.
*587 Johnie O'Neal, Tulsa, OK, for Thomas Joseph Grasso.

ORDER
SEAY, Chief Judge.
In this action for a declaratory judgment pursuant to the provisions of 28 U.S.C. §§ 2201 and 2202, the State of New York seeks a declaration and determination of their rights and obligations vis-a-vis those of the State of Oklahoma with respect to defendant Thomas Joseph Grasso ("Grasso") under the Interstate Agreement on Detainers Act ("the Act") enacted by the States of Oklahoma and New York. Okla.Stat.Ann. tit. 22, §§ 1345-48, and N.Y. CPL § 580.20).[1] Specifically, the State of New York asks this court to make the following determinations: 1) that the Act obligates the State of Oklahoma to deliver Grasso to the custody of the State of New York before the execution of the death sentence imposed by the District Court of Tulsa County, Oklahoma, and 2) that the Act obligates the State of New York to demand that the State of Oklahoma deliver Grasso to the custody of the State of New York before the execution of such death sentence. The parties have fully briefed the issues relevant to the resolution of this controversy and the court now has before it for its consideration the parties' respective motions for summary judgment.

Parties
Grasso, who was previously committed to the custody of New York correctional officials at the Sing Sing Correctional Facility in Ossining, New York, is currently being detained at the Oklahoma State Penitentiary in McAlester, Oklahoma. Plaintiffs are the State of New York by and through Thomas A. Coughlin, III, ("Coughlin"), Commissioner of the New York State Department of Correctional Services and the New York Administrator of the Act; and John P. Keane ("Keane"), Superintendent of the Sing Sing Correctional Facility (collectively referred to as "New York"). In addition to Grasso, plaintiffs bring this action against defendants Wellon B. Poe ("Poe"), Assistant Attorney General of the State of Oklahoma and the Oklahoma Administrator of the Act; Larry Fields ("Fields"), Director of the Oklahoma Department of Corrections; Dan Reynolds ("Reynolds"), Warden of the Oklahoma State Penitentiary; and David A. Moss ("Moss"), District Attorney of Tulsa County (District # 14), Oklahoma (collectively referred to as "Oklahoma").

Background
Grasso was convicted of murder in the second degree by a jury in the County of Richmond, New York, and was sentenced on April 21, 1992, to a term of imprisonment of a minimum of twenty (20) years to a maximum term of imprisonment of life, with eligibility for parole on July 9, 2011. Grasso was committed to the custody of the Department of Correctional Services of the State of New York and delivered to the Ossining Correctional Facility, Ossining, New York, to serve out his sentence. Under the provisions of the Act, Moss's office lodged a detainer against Grasso and submitted a request for temporary custody to Keane on July 8, 1992, wherein Moss sought the delivery of Grasso in order to bring him to trial pursuant to an August 15, 1991, information filed against Grasso in the District Court of Tulsa County charging Grasso with first degree burglary and first degree murder. As part of this request, Moss agreed "that immediately after trial is completed in this jurisdiction I will return the prisoner directly to you or allow any jurisdiction you have designated to take temporary custody." After the lodging of the detainer and the receipt of the request for temporary custody, Keane notified Grasso of the untried Oklahoma information and informed him of his right to request disposition of such information. On July 14, 1992, Grasso executed a request for final disposition of the untried Oklahoma information. As part of this request, Grasso gave his "consent voluntarily to be returned to the institution in which I am now confined." Pursuant to Grasso's request for final disposition, Keane sent an offer to deliver temporary custody of Grasso to Moss. On August *588 4, 1992, Moss sent his acceptance of temporary custody of Grasso to Keane. On August 17, 1992, the New York officials transferred temporary custody of Grasso to two individuals who were officially designated by Poe to return Grasso to the State of Oklahoma to stand trial on the Oklahoma charges.
On September 4, 1992, Grasso was bound over for trial following his preliminary hearing in the District Court of Tulsa County. On September 11, 1992, Moss filed a bill of particulars seeking the death penalty on Grasso's first degree murder charge. Grasso pled guilty to both the burglary and murder charges on September 28, 1992. Thereafter, on September 30, 1992, the District Court of Tulsa County found Grasso guilty on both charges and he was sentenced to death by lethal injection on the murder charge and to five hundred (500) years on the burglary charge. On October 2, 1992, the District Court of Tulsa County entered its judgment and sentence on Grasso's murder conviction and issued a death warrant setting an execution date of December 4, 1992. This execution date was subsequently stayed on November 23, 1992, by the Oklahoma Court of Criminal Appeals pending that court's mandatory sentence review.
On October 8, 1992, Oklahoma confirmed Grasso's conviction and sentence with New York and requested the status of Grasso's New York murder conviction and sentence. On October 26, 1992, New York responded by informing Oklahoma of Grasso's twenty (20) to life sentence, with eligibility for parole on July 9, 2011, and requested to be advised by Oklahoma as to when Grasso would be returned to New York to serve out his New York sentence in accordance with the Act. The next documented communication between Oklahoma and New York was a February 9, 1993, letter from Moss to New York officials informing them that Grasso has waived his rights under the Act and expressed a wish to be executed as soon as possible. Moss stated that Grasso was in the custody of the Oklahoma Department of Corrections pending the mandatory review by the Oklahoma Court of Criminal Appeals and that "[i]t is the intention of the State of Oklahoma to honor Mr. Grasso's request to be executed for his crimes and his waiver of rights under the Interstate Agreement on Detainer." On March 8, 1993, Coughlin's office wrote to Poe and informed him of New York's right to custody and jurisdiction over Grasso. Coughlin's office requested that Poe make immediate arrangements for the return of Grasso to New York. On April 22, 1993, Moss and the Attorney General of Oklahoma informed Coughlin by letter that as counsel for the State of Oklahoma they felt "a strong obligation" to see that Grasso's request to be executed be carried out and that they were going "to aggressively seek to prevent Mr. Grasso's involuntary return to New York. Again, in a detailed letter dated May 3, 1993, Coughlin responded by reiterating New York's position that under the Act Oklahoma must return Grasso to New York.
On July 15, 1993, the Oklahoma Court of Criminal Appeals affirmed the judgment against Grasso, found his waiver of the right to direct appeal of the judgment to be proper, and affirmed the imposition of the death sentence. On August 5, 1993, New York filed this declaratory judgment action. On September 1, 1993, the Oklahoma Court of Criminal Appeals set Grasso's execution date for October 19, 1993.

Statutory Construction
In 1934, the United States Congress authorized States to enter into "agreements or compacts for cooperative effort and mutual assistance in the prevention of crime and in the enforcement of their respective criminal laws and policies, and to establish such agencies, joint or otherwise as they may deem desirable for making effective such agreements and compacts." Crime Control Consent Act of 1934, 48 Stat. 909, as amended. Subsequent to this congressional authorization, New York and Oklahoma enacted substantially similar Acts under which they, as member States, joined with other member States in a cooperative effort to resolve untried indictments, informations or complaints emanating from another member's jurisdiction. In the instant case, the parties do not dispute that Grasso was properly brought to Oklahoma under the procedures outlined under the Act. The controversy herein arises solely in the context of whether Grasso must *589 be returned to New York now that the untried Oklahoma charges have been resolved and Grasso has received a death sentence in Oklahoma.
While the court recognizes that political, moral and philosophical underpinnings permeate this litigation, the court is steadfast in its belief that its function is not to legislate from the bench, but rather, to interpret the law as enacted by the legislature and apply it to the facts at hand. As eloquently stated by the Tenth Circuit Court of Appeals in Resolution Trust Corp. v. Westgate Partners, Ltd., 937 F.2d 526 (10th Cir.1991):
The words chosen by Congress are a restraint upon the courts, and if we are not tethered by them in all but the most compelling of cases, then there is left no restraint effectively to corral the power of the courts from substituting their judgment of proper public policy for that of the legislature's.
Id. at 531. As a result, the court's resolution of New York's request for declaratory relief is governed by, and dependent upon, an interpretation of the States' respective rights and obligations under the provisions of the Act. Several principles of statutory construction guide the court in its review. The language of the statute itself is the starting point when statutory interpretation is required. Pennsylvania Public Welfare Dept. v. Davenport, 495 U.S. 552, 557-58, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1989); O'Connor v. U.S. Dept. of Energy, 942 F.2d 771, 773 (10th Cir.1991). When the words are clear and unambiguous, their plain meaning controls except in "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." UTE Distribution Corp. v. U.S., 938 F.2d 1157, 1162 (10th Cir.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 2273, 119 L.Ed.2d 200 (1992) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). When the ordinary meaning of words renders a statute clear and unambiguous, a heavy presumption exists that the legislature meant what it said. Westgate, 937 F.2d at 531.
A brief summary of the relevant provisions of the Act as enacted by both Oklahoma and New York is necessary.[2] Article I of the Act sets forth the underlying findings and purpose of the Act. In the first sentence of Article I, the States have found that "charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation." Art. I. Article I further outlines the policy and purpose of the Act as encouraging "the expeditious and orderly disposition of such charges" and "to provide such cooperative procedures" which would facilitate the disposition of such charges. Art. I.
Articles III and IV are the central provisions of the Act which provide the mechanism for the transfer of a prisoner from the State he is incarcerated in to the State which wishes to prosecute him and dispose of untried charges. Under Article III, a prisoner against whom a detainer has been filed must be promptly notified by the officials having custody over him. Art. III(c). The prisoner can then request a final disposition of the charges giving rise to the detainer and the jurisdiction that lodged the detainer must bring the prisoner to trial within one hundred eighty (180) days, subject to a continuance for good cause shown. Art. III(a). Any request for final disposition under Article III operates as a "consent voluntarily to be returned to the original place of imprisonment." Art. III(e). Under Article IV, a prosecutor who has lodged a detainer against the prisoner in another State can secure that prisoner's presence to dispose of outstanding charges. After a detainer has been lodged against the prisoner, the prosecutor can secure the prisoner's presence by filing a written request for temporary custody. Art. IV(a). If a prisoner's presence is secured under Article IV, he must be brought to trial *590 within one hundred twenty (120) days, subject to a continuance for good cause shown. Art. IV(c).
Article V contains the relevant provisions which relate to the return of a prisoner under the Act. Article V(d) defines the "temporary custody" referred to throughout the Act as meaning "only for the purpose of permitting prosecution on the charge or charges contained in one or more untried indictments, informations or complaints which form the basis of the detainer or detainers or for prosecution on any other charge or charges arising out of the same transaction." Art. V(d). The express provision governing the return of prisoners is found in Article V(e), which provides that "[a]t the earliest practicable time consonant with the purposes of this agreement, the prisoner shall be returned to the sending State." Art. V(e). Finally, Article V(g) provides that "[f]or all purposes other than that for which temporary custody as provided in this agreement is exercised, the prisoner shall be deemed to remain in the custody of and subject to the jurisdiction of the sending state." Art. V(g).
It is argued by New York that the express language of Article V(e) obligates Oklahoma to return Grasso to New York. New York claims that the purpose of the Act  the expeditious and orderly disposition of the outstanding charges  has been satisfied in light of Oklahoma's prosecution of Grasso; consequently, Oklahoma is obligated to return Grasso to New York under Article V(e). Oklahoma, however, disagrees and argues that the purpose of the Act is not related to the disposition of outstanding charges, but rather, that the Act, as reflected in the first sentence of Article I, is designed for the benefit of the prisoner and has as its purpose the facilitation of the prisoner's "treatment and rehabilitation". Based on this argument, Oklahoma contends that the return provisions of the Act do not apply because the imposition of the death penalty by Oklahoma negates any recognizable interest Grasso has in programs of prisoner treatment and rehabilitation in New York.
The court finds that Oklahoma's position is not supported by the clear language of the Act. In reaching this conclusion, the court finds guidance in the analysis undertaken by the Supreme Court in Carchman v. Nash, 473 U.S. 716, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1984). In Carchman, the Supreme Court determined that a prisoner does not have the right under the Act to demand the speedy disposition of a probation-violation charge since such a charge is not a detainer based on "any untried indictment, information or complaint," within the meaning of Article III. Id. at 726, 105 S.Ct. at 3406. The Supreme Court's decision was based on its review of the language of Article III which "makes clear that the phrase `untried indictment, information or complaint' in Art. III refers to criminal charges pending against a prisoner." Id. at 725, 105 S.Ct. at 3406. Since a probation-violation does not result in the prisoner being "prosecuted" or "brought to trial" on criminal charges, the Supreme Court refused to apply the act to detainers based on probation-violation charges. Id. at 725-26, 105 S.Ct. at 3406.
In conformity with the Supreme Court's "plain language" analysis in Carchman, the court finds that the language of Article V compels Grasso's return to New York. The limits of the "temporary custody" under the Act are defined under Article V(d) which provides for the sending State to turn over custody of a prisoner to a receiving State "only for the purpose of permitting prosecution" of the untried charges. The word "prosecution" contemplates a proceeding instituted and carried on for the purpose of determining the guilt or innocence of a person charged with a crime. Black's Law Dictionary 1099 (5th ed. 1979); cf. United States v. Coffman, 905 F.2d 330, 332 (10th Cir.1990) (court indicates "prosecution" refers to the total proceedings based on untried charges). Thus, when read in conjunction with the "prosecution" allowed by Article V(d), the phrase "temporary custody" equates with physical control over a prisoner only for the limited period of time involved in adjudicating the charges against him. This construction is further buttressed by Article V(g)'s mandate that the prisoner within the "temporary custody" of a receiving State "is deemed to remain in the custody of and *591 subject to the jurisdiction of the sending state." Art. V(g). The "temporary custody" allowed under Article V(d) does not expressly, or by implication, indicate custody for the purpose of service or execution of sentence in the receiving State. Indeed, nowhere in the Act does it suggest this type of transfer of permanent custody. Where the contours of the "temporary custody" contemplated under the Act have been outlined by the legislature's use of clear and plain language, this court is constrained from inserting any exception, death penalty or otherwise. Consequently, the court finds that under Article V(e) Oklahoma is required to return Grasso to New York for service of his New York sentence prior to the execution of his Oklahoma death sentence.
The court has considered, but rejected, Oklahoma's contention that the return provisions of Article V do not apply to Grasso because he no longer has any interest in treatment and rehabilitation. Oklahoma's argument is premised upon the assumption that if a particular sentence imposed by a receiving State does not enhance a prisoner's treatment and rehabilitation, then the purposes of the Act are frustrated and the receiving State may retain the prisoner. Oklahoma's focus on the efficacy of prisoner treatment and rehabilitation is misplaced. As noted by the Supreme Court in United States v. Mauro, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978), the informal practice of filing detainers obviously created problems for prisoners as well as prison officials. Id. at 359-60, 98 S.Ct. at 1846-47. "The adverse effects of detainers that prompted the drafting and enactment of the Agreement are thus for the most part the consequence of the lengthy duration of detainers." Id. at 360, 98 S.Ct. at 1847 (emphasis added). To address the problem created by detainers the Act was enacted for the purpose of "encourag[ing] the expeditious disposition of such charges and to provide cooperative procedures among member States to facilitate such dispositions." Id. at 351, 98 S.Ct. at 1842; see Fex v. Michigan, ___ U.S. ___, ___, 113 S.Ct. 1085, 1092, 122 L.Ed.2d 406 (1993) (Blackmun, J., dissenting) (the Act provides "a swift and certain means for resolving uncertainties and alleviating the disabilities created by outstanding detainers"); Yellen v. Cooper, 828 F.2d 1471, 1473 (10th Cir.1987) (the Act remedies hardships resulting from the use of detainers and eliminates potential abuses of the detainer system). Thus, the Act operates by shortening the time frame detainers remain outstanding and requiring the expeditious resolution of untried charges. While disruption of prisoner rehabilitation and treatment may have been one of the multitude of adverse side-effects caused by the use and duration of detainers, the clearly stated purpose of the Act is the disposition of the charges underlying the detainer. The eradication of the adverse side-effects attendant to a detainer is merely the by-product of the achievement of the purpose of the Act  disposal of untried charges. Whether a prisoner's rehabilitation and treatment may be advanced or hindered as a consequence of the disposition of such charges does not alter the nature of the purpose for which the Act was enacted.[3]
Consequently, the court finds without merit Oklahoma's contention that the return provisions of Article V(e) do not require Grasso's return to New York because Grasso, being under a sentence of death in Oklahoma, has no interest in rehabilitation and treatment.

Judicial Decisions
In addition to its argument based on a statutory construction of the Act, Oklahoma relies on three State court cases, People v. Guest, 115 Ill.2d 72, 104 Ill.Dec. 698, 503 N.E.2d 255 (1986), cert. denied, 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987), Moon v. State, 258 Ga. 748, 375 S.E.2d 442 (1988), cert. denied, 498 U.S. 1083, 111 S.Ct. 1638, 113 L.Ed.2d 733 (1991), and People v. Pitsonbarger, 142 Ill.2d 353, 154 Ill.Dec. 562, *592 568 N.E.2d 783 (1990), cert. denied, ___ U.S. ___, 112 S.Ct. 204, 116 L.Ed.2d 163 (1991), in support of its theory that Article V(e) does not require the return of Grasso to New York because he is under a sentence of death imposed by Oklahoma. In each of these cases, a prisoner was brought to a receiving State pursuant to the Act and was given a sentence of death in the receiving State. The prisoner argued that he must be returned to the sending State to complete his term sentence prior to the sentence of death being carried out. The rationale of the courts in rejecting the prisoners' arguments was two-fold. First, although the courts recognized Article V(e)'s requirement that the prisoner be returned to the sending State, they summarily determined that such provision did not apply where the prisoner was sentenced to death in the receiving State. As noted in the discussion above, this court has rejected a similar argument raised by Oklahoma as inconsistent with the plain language of the Act. Second, the courts relied on the fact that the respective States had entered into cooperative arrangements regarding the custody of the prisoners.[4] The facts of the instant case, however, dictate a different conclusion as Oklahoma and New York have never entered into a cooperative arrangement. Consequently, Moon, Guest and Pitsonbarger are distinguishable and do not compel a finding that Oklahoma has the right under the Act to retain custody of Grasso.

Waiver
The court is confronted with two issues with respect to waiver. First, is Grasso's waiver of his return to New York effective under the Act? Second, can New York waive the application of the return provision and allow Oklahoma to retain Grasso for execution of his death sentence prior to his service of his New York sentence?
In response to the issue of Grasso's waiver, the court finds such waiver ineffective. Under the Act, the question of jurisdiction and custody of prisoners is essentially one of comity between the member States and not a personal right of prisoners. See Jones v. Taylor, 327 F.2d 493 (10th Cir.), cert. denied, 377 U.S. 1002, 84 S.Ct. 1937, 12 L.Ed.2d 1051 (1964). As determined above, Article V(e) requires that the prisoner be returned to the sending State. While a prisoner may have certain clearly specified rights under Articles III and IV of the Act with respect to notice of a detainer, the right to request final disposition of charges, and the commencement of trial, the Act does not provide, much less suggest, that a prisoner has the right to dictate the order in which he is to serve his multiple sentences.[5] The court therefore finds that Grasso's waiver is ineffective as he has no standing to complain about, or dictate, the order of punishment for his multiple offenses. See Lionel v. Day, 430 F.Supp. 384, 386 (W.D.Okla.1976) (defendant who has violated the criminal laws of both the federal and state governments may not complain about the order in which he is tried or punished).
With respect to the issue of whether New York may waive the return of Grasso, the court concludes that nothing in the Act prevents New York from waiving the return of Grasso. Certainly, New York as a member State may waive any of its rights under the Act, including its right to have Grasso returned to its jurisdiction. The underlying principles of comity when considered in connection with the Act's emphasis on "cooperative procedures", strongly indicate *593 that New York may enter into an agreement with Oklahoma to waive the return of Grasso to New York. That decision, however, must necessarily be a cooperative custodial arrangement entered into between New York and Oklahoma. Absent such arrangement and waiver, the return provisions of the Act mandate that Oklahoma return Grasso to New York in order to serve out his New York sentence prior to the execution of his death sentence in Oklahoma.

Conclusion
To reach the result suggested by Oklahoma would require the court to engage in a manipulation of the rules of statutory construction solely for the purpose of "legislating" from the bench a policy of custodial rights which is not apparent from a plain reading of the statute. Although there may be a plethora of persuasive and redeeming arguments for a mechanism whereby a prisoner receiving the death penalty need not serve out an existing term sentence prior to the execution of his death sentence, this court is not at liberty to substitute its judgment for the collective wisdom of the legislature. Consequently, New York's request for declaratory relief is granted in part and denied in part as follows: 1) Oklahoma is obligated under the terms of the Act to return Grasso to the custody of New York for service of his New York sentence prior to his Oklahoma death sentence being carried out and 2) New York may waive its right to have Grasso returned to New York to serve out his New York sentence by entering into a cooperative custodial arrangement with Oklahoma.
IT IS SO ORDERED.
NOTES
[1] As a congressionally sanctioned interstate compact, the Act constitutes federal law which brings the instant controversy within the court's federal question jurisdiction. 28 U.S.C. § 1331; Cuyler v. Adams, 449 U.S. 433, 438-442, 101 S.Ct. 703, 706-707, 66 L.Ed.2d 641 (1981).
[2] The provisions which control the court's decision are the same under both the Oklahoma and New York versions of the Act.
[3] Extending Oklahoma's argument to its logical conclusion, courts would be required in every case, no matter what the subsequent sentence may be, to engage in a qualitative analysis of the effect a particular sentence would have on a prisoner to determine if that prisoner's treatment and rehabilitation would be facilitated. Given the limited record when addressing issues under the Act, this is clearly not a workable approach.
[4] Although Guest did not contain such an arrangement between the States, the court expressed its "grave doubts" that the Act applied and directed the Attorney General of Illinois (receiving state) to communicate with officials from Missouri and California (sending states) to determine if the sending States would waive their rights to the custody of the prisoner. Guest, 104 Ill.Dec. at 717, 503 N.E.2d at 274.
[5] In fact, when a prisoner makes a request for final disposition under Article III, as Grasso did herein, he "consents voluntarily to be returned to the original place of imprisonment in accordance with the provisions of this agreement" to complete his original sentence. Art. III(e). Thus, even assuming by implication that this provision grants Grasso the right to dictate that Oklahoma exercise primary jurisdiction over him, his execution of the request for final disposition is an affirmative act which signals a waiver of that right. See Yellen, 828 F.2d at 1474.