Submitted December 28, 2012, appeal dismissed in part; otherwise affirmed December 26, 2013, petition for review denied May 8, 2014 (355 Or 380)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## GABRIEL DAVID SILLS,
*Defendant-Appellant.*

### Jackson County Circuit Court
992639FE; A146207

317 P3d 307

Peter Gartlan, Chief Defender, and Neil F. Byl, Deputy Public Defender, Office of Public Defense Services, filed the opening brief for appellant. Gabriel David Sills filed the supplemental brief *pro se.*

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Janet A. Klapstein, Senior Assistant Attorney General, filed the brief for respondent.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Defendant, who was sentenced 10 years after his trial, seeks outright dismissal or a reversal of his convictions for sexual abuse in the first degree, ORS 163.427, and public indecency, ORS 163.465, or else resentencing on the first-degree sexual abuse count. After his conviction in Oregon, defendant fled the jurisdiction. Years later, he was convicted and sentenced in California for other sex offenses and then extradited, sentenced in this case, and returned to continue serving his California sentence.

Defendant now contends that he is entitled to dismissal of his convictions in this case with prejudice because he was not timely sentenced under the Interstate Agreement on Detainers (IAD), ORS 135.775. Defendant also argues, among other things, that he is entitled to a new trial because (1) the trial court erroneously admitted evidence that he had committed another crime and (2) his motion to suppress statements he made after invoking his right to counsel should have been granted. Alternatively, he argues that his 75-month Measure 11 sentence for first-degree sexual abuse is unconstitutionally disproportionate. For the reasons stated below, we decline to consider those assignments of error in which defendant requests a reversal of his convictions for a new trial, based on the former fugitive doctrine, and we reject both defendant's IAD argument and his sentencing argument on their merits.[1] Accordingly, we dismiss the appeal in part and otherwise affirm.

The event relating to the sexual abuse count occurred in June 1999. The victim, H, was a 13-year-old girl who was walking home from school with two friends when she saw defendant walking ahead of them. Defendant turned around, walked by the girls, and grabbed H's breast

---

[1] In a supplemental brief, defendant also asserts six *pro se* assignments of error, in which he challenges (1) the denial of a motion for continuance of the trial date to allow an alibi witness to testify, (2) prosecution witnesses being allowed to see photographs of defendant before trial, (3) a witness identification when the witness was given an array of photographs with a spot near defendant's photograph, (4) and (5) various pretrial actions of the police and prosecutors, which he contends amounted to misconduct that impaired his right to a fair trial, and (6) an assertion as to the insufficiency of the evidence unsupported by argument. We decline to consider the first five of those assignments based on the former fugitive doctrine and reject the sixth because it is without merit.

with his hand for several seconds. The girls eventually ran to a neighboring house and contacted police, and defendant ran off in the other direction.

The event leading to the public indecency count occurred the next day, when defendant exposed himself to J, a 13-year-old girl who was walking home from the school bus stop. As J walked by, defendant leaned his head out of his parked truck and said something. J could not hear defendant, so she went closer to the truck. As she approached, defendant showed her a pornographic magazine and asked her if she wanted it. J said no and began to walk away. Defendant then put down the magazine, exposing himself, rubbed his penis, and asked J, "Do you want some of this Honey?" J then fled, screaming. People nearby were able to get the license plate number of the truck before defendant sped away.

Defendant was arrested the same day and was later indicted for sexual abuse in the first degree, public indecency, and furnishing obscene materials to a minor. Defendant pleaded guilty to public indecency, and a demurrer was granted on the furnishing obscene materials count.

After a jury trial in 2000, defendant was found guilty of sexually abusing H. In that trial, the jury heard evidence concerning the indecent exposure incident involving J. However, before defendant could be sentenced, he fled the jurisdiction. After fleeing, defendant lived in California under an assumed name. When he fled, the $100,000 in bail that his parents had posted was forfeited.

In 2006, defendant was arrested in California for possession of child pornography and for sex crimes involving a four-year-old girl. The State of Oregon quickly learned in 2006 that defendant had been arrested; however, the state could not secure defendant's return to Oregon until after his pending charges in California were resolved. After his conviction by way of a guilty plea, he was sentenced in California in December 2008, with his earliest parole date in 2021.

After his California sentencing, the Jackson County District Attorney's Office sought a detainer on defendant,

and, in April 2009, defendant requested to be brought to "trial" in Oregon under the IAD, although the district attorney never received defendant's demand. Later in 2009, California officials told defendant that the IAD was inapplicable to a sentencing proceeding, and California did not proceed under the IAD.

Ultimately, California returned defendant to Oregon for sentencing in this case. In 2009, the district attorney's office pursued defendant's return for sentencing under the Uniform Criminal Extradition Act, ORS 133.743 to 133.857. In February 2010, the state requested that California return defendant to Oregon in a requisition signed by Governor Kulongoski. *See* ORS 133.833 (describing process for requisition). Governor Kulongoski, in March 2010, and California Governor Schwarzenegger, in April 2010, then signed an executive agreement for defendant's extradition. It provided that defendant would be transported to Oregon for sentencing and then returned to California to serve the remainder of his California sentence. *See* ORS 133.835 (governing extradition of person imprisoned in another state through executive authority of that state and the Governor).

Defendant was returned to Oregon in May 2010. At his Oregon sentencing, defendant acknowledged that he left the state to avoid being sentenced. On the public indecency conviction, the sentencing court sentenced defendant to a jail term to run concurrently with his sentence in California. On the first-degree sexual abuse conviction, the court sentenced him to serve a Measure 11 sentence of 75 months, consecutive to his sentence in California. Defendant—finally sentenced 10 years after his trial—now appeals that judgment of conviction and his Measure 11 sentence.

A. *Former fugitive doctrine*

The state urges us to exercise our discretion to dismiss defendant's appeal under the "former fugitive doctrine." Under that doctrine, an appellate court has inherent judicial authority to dismiss a criminal defendant's appeal if the defendant's former fugitive status significantly interfered with the operation of the appellate process. *State v. Lundahl*, 130 Or App 385, 390, 882 P2d 644 (1994). A

defendant's former fugitive status significantly interferes with the appellate process when "a long escape, even if ended before sentencing and appeal, * * * so delay[s] the onset of appellate proceedings that the Government would be prejudiced in locating witnesses and presenting evidence at retrial after a successful appeal." *State v. Ristick*, 204 Or App 626, 628-29, 131 P3d 762 (2006) (internal quotation marks omitted; brackets and omission in *Ristick*).

The state argues that this case is substantially similar to *Lundahl* and *Ristick*—two cases in which we dismissed appeals taken by defendants who had fled Oregon before sentencing, eventually were caught, sentenced, and then appealed years after their trials. The state contends that the same kinds of considerations in this case call for us to exercise our inherent authority to dismiss defendant's appeal:

> "Defendant's offenses occurred in 1999, and he was tried in 2000. The transcripts show that the state called 21 witnesses at trial; the victims were 14 at the time, as were several of the eyewitnesses. The relief defendant seeks is not merely resentencing, but retrial, now 12 years later.
>
> "The prosecutor *was* able to locate the two victims to speak at sentencing in 2010, to describe the impact of the crimes. Even so, retrial would be significantly difficult at this point. Under the executive agreement between the Oregon and California governors, defendant has already been returned to California to complete a 12-year sentence imposed there."

(Record citations omitted; emphasis in original.) The state argues that procuring defendant for retrial from California following this appeal would require significant delay and expense to the state and that it would be inequitable to order retrial after a 10-year delay between trial and sentencing attributable to defendant's flight from Oregon to avoid sentencing. We agree with the state that defendant forfeited the right to appeal his convictions under our case law.

In *Lundahl*, the defendant had been tried and found guilty of multiple charges for sexually molesting an 11-year-old girl. Before he could be sentenced on all of the charges, however, he fled the country. Seven years later, he

was recaptured when he returned to the United States and was finally sentenced on the remaining charges. The defendant appealed his convictions, arguing that he was entitled to a new trial based on the lower court's finding that one of the jurors had been incompetent. The state argued that the defendant forfeited his right to appeal his convictions when he escaped before sentencing and eluded capture for seven years.

Relying on the United States Supreme Court's decision in *Ortega-Rodriguez v. United States*, 507 US 234, 113 S Ct 1199, 122 L Ed 2d 581 (1993),[2] we adopted the "former fugitive doctrine" and concluded that the defendant's lengthy escape significantly interfered with the appellate process and therefore warranted the dismissal of his appeal. *Lundahl*, 130 Or App at 390. Important to that conclusion was our consideration of the amount of time that had passed since trial, the age of the victim, the availability of witnesses, how the jury would react to the testimony of the victim now that she was older, and the effect of the passage of time on the witnesses' memories of the events. We explained:

> "If we were to resolve the merits of this appeal in defendant's favor, he would be entitled to a new trial. Because of his lengthy escape, ten years will have passed between the time that he committed the charged offenses and the time of his re-prosecution. The victim is now a 22-year-old woman who has spent several years in counseling trying

---

[2] In *Ortega-Rodriguez*, the Supreme Court addressed whether the Eleventh Circuit's adoption of a rule allowing automatic dismissal of appeals taken by former fugitives was appropriate. 507 US at 242-43. The Court explained that

> "the justifications we have advanced for allowing appellate courts to dismiss pending fugitive appeals all assume some connection between a defendant's fugitive status and the appellate process, sufficient to make an appellate sanction a reasonable response. These justifications are necessarily attenuated when applied to a case in which both flight and recapture occur while the case is pending before the district court, so that a defendant's fugitive status at no time coincides with his appeal."

*Id.* at 244 (footnote omitted). The Court then concluded that "the same interests do not support a rule of dismissal for all appeals filed by former fugitives, returned to custody before invocation of the appellate system. Absent some connection between a defendant's fugitive status and his appeal, * * * the justifications advanced for dismissal of fugitives' pending appeals generally will not apply." *Id.* at 249. The Court emphasized that, although an automatic dismissal is not appropriate, it did "not hold that a court of appeals is entirely without authority to dismiss an appeal because of fugitive status predating the appeal." *Id.*

to deal with the trauma that defendant now admits he inflicted upon her when she was a child. Further, as the state notes, a jury may respond very differently to the testimony of an adult woman than it would to the same events as recounted by an 11-year-old girl. The state would also be prejudiced by having to locate witnesses who testified in 1975, including a staff member of the state Children's Services Division and the young boy, now age 19, to whom the victim first reported that she had been molested. Even assuming that those witnesses could be located, their memories of the event have likely diminished."

*Id.*

*Ristick* involved similar facts, though the defendant there sought resentencing on appeal—not a new trial. In that case, the defendant was convicted of two counts of aggravated theft in 1995, but before he could be sentenced he fled and remained a fugitive for over seven years. In 2004, the defendant was finally sentenced. The defendant appealed, challenging certain sentencing determinations, but did not seek a new trial. We determined that the former fugitive doctrine applied, and militated in favor of dismissing the defendant's appeal. 204 Or App at 630.

In reaching that conclusion, we explained that, if we were to remand the case for resentencing, absent a waiver by the defendant, the sentencing court would be required to empanel a jury to establish findings of enhancement facts. *Id.* at 631. We noted that that hearing would be impaired by the fact that almost 10 years had passed since the defendant's conviction; that the state "would be prejudiced in its effort to locate witnesses familiar with the crimes"; and that the victim, then 90 years old, suffered from dementia. *Id.* From those circumstances, we concluded that "the condition of the evidence, worsened by [the] defendant's long flight from the jurisdiction, would limit the state's ability to support a recommendation of upward departure and the resentencing court's ability to exercise the full range of tools at its disposal to impose an appropriate sentence." *Id.*

We also found it significant that the legal basis for the defendant's challenges on appeal had developed through a seminal United States Supreme Court case decided *after* he had fled. We noted that, if we permitted the defendant's

appeal, he would actually benefit from the fact that he had fled the jurisdiction. *Id.* As a result, we concluded that allowing the defendant's appeal in that case "would not foster respect for the judicial process or promote the administration of justice," and that, "[b]ecause defendant's legal support for his challenge to his sentence is available now only as a consequence of his flight, entertaining those arguments would allow defendant to benefit from flouting the judicial process and leave others undeterred from doing the same." *Id.*

As in *Lundahl* and *Ristick*, the former fugitive doctrine is applicable in this case, and we conclude that defendant's fugitive status has significantly interfered with the appellate process, justifying our dismissal of his appeal to the extent he seeks reversal of his convictions and a new trial.[3] Here, the 10-year delay between defendant's trial and sentencing was the result of his fleeing from Oregon, which defendant admitted he did to avoid being sentenced. Defendant was discovered in 2006 when he was arrested in California, but he could not be returned to Oregon until after he was tried and sentenced there. Thus, the source of the delay between defendant's trial and sentencing is traceable to defendant's actions.

We agree with the state that a new trial would pose significant obstacles in regard to the witnesses it had called in the first trial. Although the state was able to locate the two victims for the sentencing hearing held in 2010,[4] and presumably would be able to find them again, the state had called a total of 21 witnesses at the original trial. Even if the state could find all of those witnesses—now 13 years later—the testimony of those witnesses has likely been affected by the protracted delay caused by defendant. Additionally, as in *Lundahl*, if a new trial were granted, the jury may react differently to the testimony of the now older victims than they

---

[3] Because we reject defendant's IAD argument, we do not discuss the state's argument that defendant's challenge to his public indecency conviction is not appealable under ORS 138.050.

[4] Only one of the victims testified at the sentencing hearing in person; the other submitted a letter read into the record by the state. The statements made by the victims at the 2010 sentencing hearing described the effects that defendant's actions had on them as they aged into young women, including the effect of defendant's escape from the criminal justice system on their feelings of insecurity.

would have to the testimony of 14-year-olds.[5] Furthermore, a number of the eyewitnesses called to testify were also 14 years old at the time of trial. We also find merit in the state's argument that arranging the transfer of defendant from California to Oregon to stand trial would require delay and expense to the state that is inequitable considering that defendant's fugitive status caused his absence.

Finally, as in *Ristick*, we find it significant that our resolution of one of defendant's challenges to his conviction would be affected—indeed benefited—by case law that has developed since he absconded. In defendant's first assignment of error, he challenges the trial court's admission of evidence of a prior bad act under OEC 404(3). In his brief, defendant acknowledges that his arguments relating to his first assignment of error are borrowed from the defendant's brief in *State v. Pitt*, 236 Or App 657, 237 P3d 890 (2010), *rev'd*, 352 Or 566, 293 P3d 1002 (2012), which was on review before the Oregon Supreme Court when defendant's brief was filed in this case. In October 2012, the Supreme Court reversed our decision in *Pitt*, and it adopted the arguments that defendant asserts in this case regarding the preconditions to admissibility of "other acts" evidence. *State v. Pitt*, 352 Or 566, 293 P3d 1002 (2012); *see also State v. Hutton*, 258 Or App 806, 816-17, 311 P3d 909 (2013) (when a defendant denies the alleged conduct, the unconditional admission of evidence of the defendant's other bad acts is plain error). Absent defendant's flight from Oregon, he would have been sentenced in 2000, and any appeal relating to that judgment would have been governed by the law as it existed at that time. In all likelihood, an appeal at that time would have resulted in a different outcome on defendant's first assignment of error (if counsel had even thought to assert it at the time). Thus, like the defendant in *Ristick*, defendant in this case would "benefit from flouting the judicial process and leave others undeterred from doing the same."

---

[5] Indeed, in her letter to the sentencing court, one of the victims, J, explained how her age affected how she understood what had happened to her:

"If you go back to my statement as a child, you will understand how innocent I was. An officer came to my house and asked me multiple times if [defendant] was erect. I had no idea what he was talking about. To many of you in the court, this may not seem like a big deal, but as a child I felt violated."

Under those circumstances, we conclude that defendant's lengthy escape from justice significantly interfered with the appellate process and forfeits his appeal except for his second assignment of error, in which he contends that he had a right to a speedy sentencing under the IAD, and his fourth assignment of error, in which he asserts a constitutional challenge to his sentence on the first-degree sexual abuse conviction.

B. *The IAD and sentencing proceedings*

At the outset, we note that defendant's IAD and sentencing assignments were not forfeited by defendant under the former fugitive doctrine because, as to those assignments, we conclude that defendant's former fugitive status does not unduly interfere with the appellate process. That is so given the potential of outright dismissal of the charges should he prevail on his IAD argument, and despite the potential additional cost to the state of resentencing in Oregon. Though we note that in *Ristick* we dismissed a defendant's appeal of his sentencing determinations under the former fugitive doctrine, a remand in that case would have required the sentencing court to conduct an evidentiary hearing to determine enhancement factors and the state to present evidence and witnesses it used at trial years before. In contrast, resolving defendant's sentencing challenge in this case would not require new factual determinations in which the state would have to call witnesses from the 2000 trial.

We proceed to the merits of defendant's second assignment of error. "The IAD is a congressionally sanctioned interstate compact among 48 states, the federal government, the District of Columbia, and various United States territories." *State v. Lewis*, 249 Or App 480, 489, 278 P3d 51, *rev den*, 352 Or 564 (2012). The IAD provides procedures for the transfer of a prisoner in one state for "trial" in another state when that state files a detainer for the prisoner because there is a pending "untried indictment, information or complaint." *See* ORS 135.775, Art III(a); ORS 135.775, Art IV(a). An inmate who is not brought to "trial" within the period provided in Article III or Article IV of the IAD "can have his or her case dismissed 'with prejudice.'" *Lewis*, 249 Or App at 489 (quoting ORS 135.775, Art V(c)).

In 2010, defendant moved for dismissal of the charges against him, asserting that the IAD applied to his sentencing and that the sentencing was untimely under the IAD. The sentencing court denied defendant's motion by written order. In that order, the court stated that "the length of delay in this matter is significant" but "is mainly due to the actions of defendant" and that "any delay attributable to the State in this matter is reasonable." As to the IAD, the court concluded that defendant had no rights under the IAD to speedy sentencing "because Oregon does not provide for sentencing in absentia on a felony case" and that defendant's attempted request for a speedy disposition of this case while he was incarcerated in California "was ineffective under ORS 135.775 because the request was not forwarded to the Jackson County District Attorney."

In his second assignment of error, defendant contends that the sentencing court erred in denying his motion to dismiss for lack of a speedy sentencing under the IAD because the IAD applies to sentencing. Whether the IAD's requirement that a defendant be transferred from one state and brought to "trial" in another includes transfer for a sentencing is a question of statutory interpretation and one of first impression in Oregon. That legal question is governed by federal, not state, law. *State v. Burss*, 316 Or 1, 4, 848 P2d 596 (1993).

Although acknowledging that "the vast majority of jurisdictions" that have considered the issue have concluded that the IAD does not apply to sentencing, defendant primarily relies on *Carchman v. Nash*, 473 US 716, 105 S Ct 3401, 87 L Ed 2d 516 (1985), as support for his contrary position that a party state must transfer a prisoner for sentencing under the IAD. That position, however, runs counter to the text of the IAD, and, rather than helping, *Carchman* undercuts defendant's argument.

Article I of the IAD sets forth its purpose:

"The party states find that charges outstanding against a prisoner, *detainers based on untried indictments, informations or complaints*, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner

treatment and rehabilitation. Accordingly, it is the policy of the party states and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints. The party states also find that proceedings with reference to such charges and detainers, when emanating from another jurisdiction, cannot properly be had in the absence of cooperative procedures. It is the further purpose of this agreement to provide such cooperative procedures."

(Emphasis added.) We conclude that the gist of Article I is that party states agree to procedures to allow transfers of prisoners to secure speedy trials in other party states where there are pending, untried charges.

The references to "untried" charging instruments found in Article I, which run through the rest of the IAD, lead us to that conclusion. Specifically, Article II(c) of the IAD defines a "receiving state" as "the state in which trial is to be had on an indictment, information or complaint pursuant to Article III or Article IV of this agreement." Article III(a) provides for a prompt "trial" when, during the prisoner's term of imprisonment in a party state, "there is pending in any other party state any untried indictment, information or complaint" and the prisoner properly requests a "final disposition" pursuant to a detainer. That request for a final disposition operates "as a request for final disposition of all untried indictments, informations or complaints." ORS 135.775, Art III(d). Similarly, in Article IV(a) of the IAD, an "officer of the jurisdiction in which an untried indictment, information or complaint is pending shall be entitled to" seek temporary custody of a prisoner. And, in Article V(d), the IAD provides that the temporary custody referred to in the IAD "shall be only for the purpose of permitting prosecution on the charge or charges contained in one or more untried indictments, informations or complaints which form the basis of the detainer or detainers or for prosecution on any other charge or charges arising out of the same transaction." Those references, and particularly the quoted text in Article V(d) referring to prosecution on a charge in an untried charging instrument, emphasize that transfers of

prisoners under the IAD are reserved for trials on charges contained in untried charging instruments. Thus, a sentencing in a criminal matter when there has already been a trial, as in this case, cannot be a "trial" on an "untried" charge in a charging instrument under the IAD.

The reasoning in *Carchman* is consistent with that conclusion. In that case, a prisoner in Pennsylvania brought a habeas corpus proceeding in which he sought dismissal of a probation violation charge in New Jersey due to that state's alleged noncompliance with the speedy-disposition requirement in Article III of the IAD. 473 US at 721-22. The Court held that the IAD does not apply to probation revocation proceedings. *Id.* at 734.

That holding was based primarily on the Court's examination of the text of the IAD. The Court first noted that "Article III by its terms applies to detainers based on 'any untried indictment, information or complaint.'" 473 US at 724. The court observed that an indictment, an information, and a complaint are "documents charging an individual with having committed a criminal offense." *Id.* And, the Court further noted that the term "untried" "would seem to refer to matters that can be brought to full trial" and determined that language in other parts of the IAD supported an interpretation that Article III applies "solely to criminal charges." *Id.* The Court concluded that

> "[a] probation-violation charge, which does not accuse an individual with having committed a criminal offense in the sense of initiating a prosecution, thus does not come within the terms of [Article] III. Although the probation-violation charge might be based on the commission of a criminal offense, it does not result in the probationer's being 'prosecuted' or 'brought to trial' for that offense. Indeed, in the context of the [IAD], the probation-violation charge generally will be based on a criminal offense for which the probationer already was tried and convicted and is serving his sentence in the sending State.
>
> "Nor, of course, will the probationer be 'prosecuted' or 'brought to trial' on the criminal offense for which he initially was sentenced to probation, since he already will have been tried and convicted for that offense."

473 US at 725. Thus, the Supreme Court concluded from its textual analysis that the IAD reaches only criminal charges in untried indictments, informations, or complaints and rejected the notion that the prisoner could be brought to "trial" because he already had been tried for the criminal offense leading to his sentence of probation and would generally be tried, convicted, and incarcerated in the sending state for the crimes that also form the basis for the probation violation charge. The Court also examined legislative history, which did not persuade it "to depart from what appears to be the plain language" of the IAD. *Id.* at 726. *Carchman,* therefore, quite strongly supports the state's position that a sentencing is not covered by the IAD.

As noted earlier, the vast majority of courts that have examined this exact issue agree that the IAD does not apply to a sentencing. Some are federal courts, *see, e.g., United States v. Coffman,* 905 F2d 330 (10th Cir 1990), and others are state courts, *see, e.g., State v. Jimenez,* 283 Neb 95, 808 NW2d 352 (2012); *State v. Barefield,* 110 Wash 2d 728, 756 P2d 731 (1988). In sum, we are in agreement with those other courts that have construed the language of the IAD and concluded that the IAD was not intended to apply to the transfer of a prisoner for a sentencing in a matter in which he already was convicted. Accordingly, we affirm the denial of defendant's motion to dismiss.

We now turn to defendant's fourth assignment of error, in which he contends that the trial court erred by imposing an unconstitutionally disproportionate 75-month mandatory Measure 11 sentence on the first-degree sexual abuse count. *See* Or Const, Art I, § 16 (providing, in part, that "all penalties shall be proportioned to the offense"). Our analysis is guided by *State v. Rodriguez/Buck,* 347 Or 46, 217 P3d 659 (2009). In those consolidated cases, the Supreme Court held that it had applied three nonexclusive factors to determine whether the sentences of the defendants were so disproportionate as to "shock the moral sense of all reasonable [people] as to what is right and proper under the circumstances." *Id.* at 57-58. Those factors were "(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other,

related crimes; and (3) the criminal history of the defendant." *Id.* at 58 (footnote omitted). As for the last factor, the court noted in both cases before it that the defendants had no prior convictions. *Id.* at 77-78.

Defendant focuses on those three factors in *Rodriguez/Buck*. First, he argues that his conduct is "slightly more serious" than the conduct at issue in *Rodriguez/Buck*, yet as in those cases, his conduct involved touching over clothing that is far less severe than other conduct that would be punished by the same Measure 11 sentence. Second, he notes that he would have received the same sentence for related and far more serious crimes, such as unlawful sexual penetration in the second degree, ORS 163.408(1) and ORS 137.700(2)(a)(O), and rape in the second degree, ORS 163.365(1) and ORS 137.700(2)(a)(K). Third, as to his criminal history, defendant acknowledges that he pleaded guilty to public indecency and had prior convictions in California for the offense of "lewd act upon a child."

The state argues that defendant's case is distinguishable from *Rodriguez/Buck* and that the sentencing court did not err in imposing the 75-month mandatory sentence under Measure 11. The state focuses on the third factor and notes that the offenders in *Rodriguez/Buck* had no prior record of offenses committed against minors, did not commit a second sex offense soon after the crime, did not flee the state, and did not commit new sex offenses on abscond status. Defendant, it notes, not only engaged in the crimes at issue in this case, but also was convicted of harassment in 1992 when he grabbed the buttocks of a 16-year-old girl in a store. Defendant's California convictions involved his sexual abuse of a four-year-old in his care by fondling her vaginal area. Defendant was also charged in California with many counts relating to the child pornography found on his computer. The state argues that defendant has victimized younger and younger children, and the sentencing court properly found that defendant posed a continued danger and that a lengthy sentence was an appropriate means of protecting the public.

We agree with the state that the sentence imposed on the sexual abuse conviction did not violate Article I,

section 16, of the Oregon Constitution. Defendant's forceful conduct in grabbing the victim's breast on the street was more serious than the conduct at issue in *Rodriguez/Buck*, and his criminal history is markedly different from those of the defendants in *Rodriguez/Buck*. The trial court did not err in imposing the sentence.

Appeal dismissed in part; otherwise affirmed.